Points decided.

[Filed November 5, 1888.]

## AUGUST ANDERSON, RESPONDENT, v. NELSON BENNETT, APPELLANT.

THE GENERAL DOCTRINE THAT A MASTER IS NOT LIABLE for injuries caused by the negligence of a fellow-servant in the same common employment is now regarded as settled law. The reason assigned for this exemption is that by his contract of employment the servant assumes the risks incident to it, and that both he and his employer had them in contemplation in fixing the compensation.

THE GENERAL RULE AS DECLARED in *Farwell* v. *Railroad Co.* that all servants employed by the same master, and working under the same control and in a common employment, are fellow-servants, has been the subject of much dispute as to its proper limitations, and in many of the States has been relaxed and modified in consequence of the hardships and injustice growing out of its too general application.

SO THAT, the later current of judicial decision, as well as legislative action, indicates a marked departure from that rule, and a disposition to so limit and restrict it as shall make the master answerable for his just share of responsibility to his servant for injuries sustained in his employment.

A MARKED CHANGE FROM THE OLD RULE is taking place in the law as to servants clothed with partial authority, only such as a foreman or superior servants, and the principle upon which such change is based is that when a master delegates any duty which he owes to his servants, he is liable for its proper performance.

GUIDED BY THIS PRINCIPLE, several tests have been applied in determining the line of demarkation between the representative of the master and the mere servant, and among them is the ruling that the master is chargeable for any act of negligence in so far as the servant is charged with the performance of the master's duty to his servants, such as the selection of competent servants, the furnishing of suitable tools and instrumentalities, the providing a reasonable safe place in which to work, and the observance of such care as will not expose the servant to hazards and perils, which may be guarded against by proper diligence, etc., and to the extent of the discharge of these duties which the master owes to his servant by the middle-man or vice-principal, the latter stands in the place of the master.

IT IS THEREFORE A DUTY which the master owes to every servant to provide a reasonably safe place at which to work, having reference to the nature of the undertaking, or the exigency of the situation, and although he is not an insurer he is bound on the same principle by the law to exercise due and proper care in this regard, as he is in hiring competent servants, or in supplying reasonably safe machinery or other appliances for the use of his servants.

AS THE DEFENDANT WAS NOT PERSONALLY PRESENT and did not promulgate or establish any suitable or needful rules and regulations for the safe and proper conduct of the work, and as the direct management or execution of the work during his term was placed in charge of C., there necessarily devolved upon him the duties in this particular which the defendant owed to his servants; and as a consequence, it became the duty of C. to provide for the safety of the servants under his control and subject to his commands, by the exercise of such care in the management and conduct of the undertaking intrusted to him, as would render reasonably safe the place at which the employees must apply the machinery and do their work.

| | |
|---|---|
| 16 | 515 |
| 19 | 527 |
| 21 | 143 |
| 21 | 451 |
| 19* | 765 |
| 25* | 359 |
| 27* | 93 |
| 28* | 497 |
| 16 | 515 |
| 25 | 294 |
| 19* | 765 |
| 35* | 654 |
| 16 | 515 |
| 34 | 251 |
| 34 | 259 |
| 34 | 260 |
| 34 | 265 |
| 16 | 515 |
| d40 | 441 |
| 16 | 515 |
| e45 | 481 |

C. WAS THUS NOT ONLY THE FOREMAN to direct the work of the hands under him,
but the person above all others to provide that they should have a reasonably
safe place at which to work, consistent with the exigencies of the situation, and
in this view it is of no importance by what name C. be called, whether a middle-
man, superintendent, or foreman.

WHEN, THEREFORE, C. ordered the plaintiff to set up the machinery and drill holes
at the place where the injury occurred, without having taken any care, or at
least, adopted some precautionary measures to discover whether there were
holes charged with giant powder which had failed to explode, and to guard
against the danger of the drills penetrating them, etc., he committed a negli-
gent or wrongful act, and exposed the plaintiff to a serious danger not con-
templated by his contract of service.

APPEAL from Multnomah County.

*George W. Yocum,* and *F. Clarno,* for Respondent.

*H. Y. Thompson,* and *George H. Williams,* for Appellant.

LORD, J.— This is an action to recover damages for personal
injuries caused by the alleged negligence of the defendant's two
servants and agents.   The complaint in effect is that the defend-
ant was engaged in constructing the tunnel on the line of the
Northern Pacific R. R. Co., and that the plaintiff was engaged in
his service for hire as a common laborer during the time therein
mentioned; that Thomas Cosgrove was the foreman, manager.
and superintendent of said work, and that plaintiff was direct
under his control and authority, and that by reason of his negli-
gence he was greatly injured and his eyesight destroyed.

The substance of the evidence is that the defendant was a con-
tractor for the construction of a tunnel for the Northern Pacific
R. R. Co., and that S. J. Bennett was his chief superintendent
and M. B. Turner was his assistant at the west end of the tunnel
where the plaintiff was engaged at work, and that Cosgrove was
the foreman of the gang or shift of men to which the plaintiff
belonged; that in the prosecution of this work there were two
shifts or gangs of men working alternately by day and night;
that in performing this work, they would clear up so much of
the broken rock and debris as would make a clean place for
them to operate their drills, which bored holes horizontally and
perpendicularly in the benches of the tunnel, then charge them
with giant powder and explode it, when that gang or shift would

retire, to be succeeded by the other, who would go through in their turn a like routine of labor; that the materials and appliances for doing the work was furnished by Bennett, the superintendent; that Cosgrove was a man of skill and experience in the business of tunneling, and that in the management of the work of blasting during his term, he acted upon his own judgment, directed and controlled the use of the explosives as well as the use and location of the machinery and drills, commanded the movements of the men under his control, and ordered them when and where and what to do, and how to do it; that he had hired and discharged men under his control, although his authority to do so was denied and contradicted, but not the fact that he had done so; that on the day of the accident the plaintiff was ordered by Cosgrove to drill a perpendicular hole in a certain rock in the tunnel, and that Cosgrove placed the drill on the spot, and ordered and directed the plaintiff to drill the hole, which he was engaged in doing when the explosion occurred that caused the injury; that the injury was occasioned by his boring into a missed or unexploded hole, which was not discoverable by reason of the neglect of the foreman to remove the debris and broken rock.

In respect to this point one witness testified, "that until a good deal of work in cleaning up had been done, that it was impossible for any one to tell whether there was any missed or unexploded holes; that they did not work long in cleaning up before they started drilling; that the missed hole which exploded and done the injury to the plaintiff was covered up with loose rock, and no one could see whether there were any missed holes or not." And again: "There was no chance to examine for missed holes until the rock was cleaned off; nobody could tell there was any missed holes because there was so much rock and debris." And when the inquiry was made why it was not cleared off so as to find out whether there were any missed or unexploded holes, the witness answered: "Because we did not have time. The foreman would not give us time, he was pushing us ahead all the time, hurrying us up." This evidence in substance is fully corroborated by others.

It is further testified to "that the first thing we did when we got in was to clean off the benches and get ready for drilling;" that before putting the drills to boring it was necessary to have a clean place, and as soon as this was done the, drilling began. As to the condition of the tunnel, Cosgrove testifies when he went in that "he looked the tunnel over to see if it was safe— supposed it was safe—that the lower part you could not tell anything about it, as it was all covered with rock." He further testified that "there was a rule for the men to look after missed holes and to report them to him," and the evidence shows that the plaintiff complied with this regulation. In this particular it may be well to note to what he testifies: "When I was drilling the first hole I discovered an unexploded hole and called the foreman's attention to it. This hole I discovered was about ten or twelve inches from the hole I was drilling, may be a little one side. I asked the foreman if he thought there was any danger for me to work in that place. He told me there was no danger, 'go ahead and work.' When the hole was finished I called the foreman's attention again, and asked him in what place he wanted me to drill the next hole, and the foreman took hold of the drill with his hand and set the hole in a perpendicular place and ordered me to drill. This was from four to five feet from the hole I had just drilled. I was drilling a perpendicular hole. When I had drilled only a short time in that place the explosion happened." And he testifies, "that the reason of the explosion was that there was a hole that failed to explode under-neath the hole that the foreman had ordered me to drill, and as soon as a part of the drill struck the powder it exploded. That explosion destroyed my eye-sight."

The evidence also shows that the men were put to work clean-ing away the debris in the first instance only for the purpose to get a clean place so as to operate the drills, and that when this was accomplished, the drills were set agoing; that with the exception of the rule already referred to, there was no other rule or regulation or instructions devised to protect or provide for the safety of the men in the course of their employment, or requiring the broken rock and loose dirt to be cleaned off so as

to discover and expose the unexploded holes before the process of drilling began.

Some idea of the force of the explosion, and the danger arising from unexploded holes, unless proper precautions are taken to discover them, is shown by the evidence when it resulted in the killing of four men outright, and seriously wounded and maimed some six or seven others of the gang. Upon substantially this state of facts the court, after giving the usual preliminary instructions to guide the jury in weighing the evidence, etc., charged them that "it was a settled rule of law that a master was not liable to his servant for injuries caused by the negligence of a fellow-servant, and if they found Cosgrove was such, their verdict must be for the defendant; that the term 'fellow-servant,' as a general rule, includes all who serve the same master, work under the same control, and derive compensation and authority from the same source, and are engaged in the same general employment, etc.; that where a master submits the substantial control of the business, or a particular department thereof, to another, giving to such party the power to select his associates, and to discharge them, and full authority to command the laborers over whom he is placed, and direct when and where and how they shall work, the party so invested with authority, although himself a servant, is not a fellow-servant of the laborers thus placed under his control, but that such party stands in the relation of vice-principal, and the master is answerable for his negligence." Then directing his instructions more particularly to the facts of the case in hand, said: "If the jury find from the evidence in this case that Cosgrove was at the time of the explosion described in the complaint charged and intrusted by the defendant with the control and management of the blasting, and the using of high explosives in the Cascades tunnel, and had authority to choose and discharge the men employed in the work, and to command and direct when, where, and how the men should work, and that in pursuance of such charge and trust Cosgrove was exercising authority over the plaintiff as one of the employees of the defendant, so that he could and did rightfully order and direct plaintiff when, how,

and where he should work, and with what tools and appliances he should work, then Cosgrove is not to be deemed a fellow-servant of the plaintiff; but in respect to this business he should be deemed as in place of the master, and Cosgrove's negligence, if he was negligent, should be deemed the negligence of the defendant. If, on the other hand, the jury find from the evidence that Cosgrove's position and authority at the time of the explosion were those simply of a foreman of a gang or shift of men, having only authority in the direction of the work of such gang or shift, then he is a fellow-servant with the plaintiff, and the defendant is not liable." It is sufficient to say that the trial resulted in a verdict and judgment for the plaintiff, from which the defendant has brought this appeal.

The contention of counsel in this case may be thus summarized: Unless Cosgrove was the fellow-servant of the other servants under his direction and control, or the instruction last referred to incorrectly defines a vice-principal or representative of the master as applicable to the facts, there is no error in the record, and we must affirm this judgment. The general doctrine that a master is not liable for the injuries caused by the negligence of a fellow-servant engaged in the same common employment is now regarded as part of the common law of this land. The reason commonly assigned for this exemption is, that by his contract of employment, the servant assumes the risks incident to it, and that both he and his master had them in contemplation in fixing the compensation. Hence it is said: "He cannot in reason complain if he suffers from a risk which he has voluntarily assumed, and for the assumption of which he is paid." (*Railroad Co.* v. *Ross*, 112 U. S. 383.) But what are the natural and ordinary risks incident to his employment, and which are supposed to have been adjusted in the stipulated compensation, and who within the principle of the rule are to be deemed fellow-servants engaged in a common employment, are questions often difficult to determine, and in respect to which the adjudged cases are so conflicting that it is impossible to reconcile them. Each case in a great measure seems to be determined by the peculiar circumstances which surround it.

Although *Murray* v. *Railroad Co.* 1 McMull. 358, was decided prior to *Farwell* v. *Railroad Co.* 4 Met. 49, yet the latter has been usually regarded as the leading case in which the doctrine of fellow-servants was first clearly enunciated, and its principles engrafted into our law. The rule as there stated by the eminent judge who delivered the opinion is to the effect that all servants of the same master whose labors tend to the accomplishment of the same general purpose, and engaged in a common employment, are fellow-servants, irrespective of their relative grade or rank. The rule as thus declared was generally accepted by the courts of the country as a correct exposition of the law, and it has been approved and adopted by the highest court in England. Within the principle of that rule, all servants, no matter what position they occupied toward each other, or how different and separated the departments of duty in which they were employed, whether operating a mine, or factory, or railway, were deemed to be fellow-servants.

In *Albro* v. *Agawar Canal*, 60 Cush. 75, the court held that a superintendent to whom the master had intrusted the entire charge of a factory, with the authority to hire and discharge the operatives, was a fellow-servant with one of such operatives. This view has been stoutly adhered to in Massachusetts ever since (*Holden* v. *Railroad Co.* 129 Mass. 268), and perhaps is still maintained in Pennsylvania. (*Coal Co.* v. *Jones*, 86 Pa. St. 438.) It seems to ignore the generally accepted idea of vice-principalship as it prevails in some of the other States, and treats all servants under the same control, who serve the same master, as fellow-servants, notwithstanding one may stand in the master's place in relation to the other. And in Great Britain, until abrogated by the Employer's Liability Act, the same principle was the settled law as declared by the highest judicial tribunal in that kingdom. (*Toilser* v. *Merry*, 1 H. L. Cas. 326.) This is specifically stated by Lord Blackburn in his comments upon that case, in which he said: "But the decision of the House of Lords is distinct, at least, so far as this, that the fact that the servant held the position of vice-principal does not affect the non-liability of the master for his negligence

as regards a fellow-servant. (*Howell* v. *Steel Co.* 10 Q. B. 62.) But in the progress of society since the decision in *Farwell* v. *Railroad Co. supra*, such has been the increase in the number and magnitude of the business operations of the country, the great army of servants required to be employed to perform their work, and the necessity of placing over them, and in charge of these vast operations, other servants to direct and control their labor, that there has been wrought in the judicial mind the conviction that the general application of that rule in such cases has often worked manifest injustice and hardship. So that the later current of judicial decision, and it may be added of legislative action, indicates a marked departure from that rule, and a disposition to so limit and restrict it as shall make the master answerable for his just share of responsibility to his servant for injuries sustained in his employment. And although it may be said that the weight of adjudged cases is, that the relative grade or rank of the servant does not alter the relation of fellow-servants, yet this principle has not always commanded universal recognition, but it has been criticised and denied, and a contrary view asserted by the courts of several of the States, and at least materially limited if not recognized and adopted by the Supreme Court of the United States.

In *Railroad Co.* v. *Kearney*, 3 Ohio St. 201, the court say: "No service is common that does not admit a common participation, and no servants are fellow-servants when one is placed in control over another." In *Darrigan* v. *Railroad Co.* 52 Conn. 185, Carpenter, J., said: "To make no discrimination, but in all cases to place those invested with authority to direct and control on the same footing with those whose duty it is merely to perform, as directed, without discretion and without responsibility, seems to us unwise and impolitic." (*Railroad Co.* v. *Bowles,* 9 Heisk. 866; *Cowles* v. *Railroad Co.* 84 N. C. 309; *Moon* v. *Railroad Co.* 78 Va. 745; *Railroad Co.* v. *May,* 108 Ill. 288; *Railroad Co.* v. *Lundstrom,* 16 Neb. 261; *Railroad Co.* v. *Collins,* 2 Duval, 114; *Creswell* v. *Railroad Co.* 30 W. Va. 38.) 1 Redfield on Railroads, page 529, n., in which the learned author says: "We would be content to treat all subordinates who are

under the control of a superior as entitled to hold such superior as representing the master."

In *Railroad Co.* v. *Ross*, 112 N. H. 377, the court below had ruled in effect that in the operation of a train, the relation of superior and inferior was created between the conductor and engineer, and therefore within the reason of the rule they are not fellow-servants, and in affirming this ruling Mr. Justice Field said: "There is, in our opinion, a clear distinction to be made in their relation to their common principle, between servants of a corporation, exercising no supervision over others engaged with them in the same employment, and agents of the corporation, clothed with the control and management of a distinct department in which their duty is entirely that of supervision and direction. A conductor having the entire charge or management of a railway train occupies a very different position from the brakeman and porters, and other subordinates employed. He is, in fact, and should be treated as the personal representative of the corporation, for whose negligence it is responsible to subordinate servants. . . . . The conductor of a railroad train, who commands its movements, directs when it shall start, at what stations it shall stop, at what speed it shall run, and has the general management of it, and control over the persons employed upon it, represents the company, and therefore, that for injuries resulting from his negligent acts, the company is responsible. If such a conductor does not represent the company, then the 'train is operated without any representative of its owner." These and other references might be made to show the extent to which the rule has been relaxed and modified in several of the States, as well as the dispute which exists as to the proper limitations. Nor can there be any doubt, but that a decided change is taking place from the old rule as to servants clothed with partial authority only, such as a foreman or upper servant, which consider such as fellow-servants with those under their control and subject to their orders, and for whose negligent acts the master was not liable.

A principle upon which a change in the law is based is that when the master delegates any duty which he owes to his serv-

ants, he is liable for its proper performance. One way of applying it in determining the line of demarkation between the middle-man or mere servant, is to ascertain whether the master has conferred on the foreman or superior servant the authority to employ and discharge the servants under his control. By some courts this seems to be. regarded as a decisive test, while others consider it only as an element, although an important one in determining that question. Another way is by considering the master liable if the negligent servant is in charge of or vested with the discretion to control and manage a branch or department of the master's business. But this must be understood to mean something more than the mere right to oversee hands or direct their labors, something more than higher wages or general superiority in position, or in skill or intelligence. Another way of testing is by holding that it is a personal or absolute obligation or duty which the master owes the servant to provide proper instrumentalities, etc., for the conduct of his business, and if he intrusts this duty to his servant instead of discharging it himself, such servant is not a fellow-servant within the meaning of the rule of liability for negligence, and the master is liable for its performance.

In Shearman and Redfield on Negligence, section 102, the law is thus stated: "One to whom an employer commits the entire charge of the business, with power to choose his own assistants, and to control and discharge them as freely and fully as the principal could himself, is not a fellow-servant with those employed under him, and the master is answerable to all under-servants for his negligence, either in his personal conduct within the scope of his employment, or in his selection of servants. Mr. Beach thinks the better rule, and the one more consonant with justice and right reason, has been well stated by McIver, J., in *Gunter* v. *Manuf. Co.* 18 S. C. 362, in this language: "The test as to whether an employer is the representative of the master, is not whether such employee has power to employ and discharge hands, or to purchase or change machinery, for which there are some of the duties of the master, they are not all his duties, and hence an employee who is not intrusted with either

of these powers may still be the representative of the master. The true test is *whether the person in question is employed to do any of the duties of the master;* if so, he cannot be regarded as a fellow-servant, but is the representative of the master, and any negligence on his part in the performance of the duty thus delegated to him must be regarded as the negligence of the master." (Beach on Contributory Negligence, §§ 110, 115.)   " When the master," says Mr. Wood, "delegates complete control over the business, or over any department thereof, to another, the person standing in his place is not regarded as a fellow-servant, but rather as a vice-principal.   In such case the person to whom such power is delegated stands in the place of, and represents the master, and all acts or omissions *in respect to the matters in which he acts in the place of the master* in performing the master's duty to the servant are the acts or omissions of the master himself." (Wood on Master and Servant, § 436.)   And he further says: "The rule established and supported by the better class of cases is, that whenever the master delegates to another the performance of a duty to his servant which the master has impliedly contracted to perform in person, or which rests upon him as an absolute duty, he is liable for the manner in which that duty is performed by the middleman whom he has selected as his agent, and to the extent of the discharge of those duties of the middleman he stands in the place of the master, but as to all other matters he is a mere co-servant."   (Wood on Master and Servant, § 437, and n. 3.)

It is thus seen, whatever diversity of opinion exists in the judicial mind as to the proper qualifications or limitations of the rule, the cases agree that the master is under no personal obligation to give his personal superintendence to the execution of the work, but that he may delegate that power, or any of the duties, to a superintendent or foreman.   The question which most frequently arises, and often the most difficult of solution, is in respect to a foreman, and the relation upon the facts in which he stands to the other servants.   It is no doubt true, as Mr. Thompson says, that a *mere foreman* of work is generally regarded as a fellow-servant under the rule; but if the master has delegated to

him or to a superintendent the control and management of the business, or some department thereof, then the rule may be different. And he says: "A true expression of the rule seems to be, that in order to charge the master, the superior servant must so far stand in the place of the master as to be charged with the duties toward the inferior servant, which, under the law, the master owes to such servant." (2 Thompson on Negligence, p. 1028.)

A foreman ordinarily works hand to hand with his co-servants, and does not have the entire charge and control of the business, or any division thereof; he does not act upon his own judgment, but is generally subject to the orders and control of a superintendent; his duties do not exceed mere direction of his co-servants, and do not include the power to hire or discharge hands, or the performance of duties which belong to the master himself. (*Indiana Car Co.* v. *Parker*, 100 Ind. 181; *Brick* v. *Railroad Co.* 98 N. Y. 211; *Doughty* v. *Penobscot Co.* 76 Me. 143; *State* v. *Malster*, 57 Ind. 287.) Now the main contention of counsel for the defendant is, that Cosgrove was a fellow-servant with those under his control, and not a vice-principal, whom he argues to create, the master must have committed to him the entire charge of the business, with full powers to select servants and discharge them, purchase materials and appliances, and do all things as fully and freely as he could himself in the management of the business. On the other hand, the contention of counsel for the plaintiff is that the master had committed to Cosgrove a distinct portion of the work, and devolved upon him the control and management of it, and the method of its execution, with power to direct the men, and enforce obedience to his orders in the prosecution of their work, which involved the performance of some duties that the master owes to the servant, and which, if he intrusts or delegates them to another, he is answerable for the manner in which they are discharged.

Tested by the rule as laid down by some text-writers, and sustained by a number of respectable authorities, Cosgrove was a fellow-servant, and not a representative of the master. He did not have delegated to him the entire charge of the business,

or any department thereof, so exclusive in its character that the master deprived himself of all authority or supervision in respect to it. Under that rule, although Cosgrove might be charged with the performance of some duty which the master owes to his servant, yet if he has not delegated to him all the master's powers and duties, surrendered to him the exclusive control and management of the enterprise or business, without reserving to himself any discretion or authority in the matter, he would be regarded as a servant in a common employment with those under him, and therefore a fellow-servant. "The true rule is," said Church, C. J., "to hold the master liable for negligence or want of proper care in respect to such duties as he is required to perform and discharge as master and principal, without regard to the rank or title of the agent intrusted with their performance. As to such acts the agent occupies the place of the master, and the latter should be deemed present, and consequently liable for the manner in which they are performed." (*Flike* v. *Railroad Co.* 53 N. Y. 553.)

The same principle was again declared in *Fuller* v. *Jewitt*, 80 N. Y. 46, in which it was held that an act or duty which the master, as such, is bound to perform for the safety and protection of his employees cannot be delegated so as to relieve him from liability to a servant injured by its omission, or its negligent performance, whether the nonfeasance or misfeasance be that of a superior or inferior officer, agent, or servant, to whom the doing of the act or the performance of the duty has been committed. "In either case, in respect to such act or duty," said the court, "the servant who undertakes or omits to perform it is the representative of the master, and not a mere co-servant with the one who sustains the injury."

The conclusion to be deduced from these and other authorities to which reference might be made is, that the master is chargeable for any act of negligence, in so far as such servant is charged with the performance of the master's duty to his servants, such as the selection of competent servants, the furnishing of suitable tools and appliances, the providing of a reasonable safe place in which to work, and the observance of such care as will not

expose the servant to hazards and perils, which may be guarded
against by proper diligence, etc.; and to the extent of the dis-
charge of these duties which the master owes to his servants by
the middle-man or vice-principal, the latter stands in the place
of the master. In this place there is no complaint that the
defendant, as master, did not select competent servants, or that he
retained incompetent ones, nor failed to supply suitable instru-
ments with which to do the work; but the grievance of
which the plaintiff complains is that he, or that his agent Cos-
grove, to whom he committed the execution of the work, failed
and neglected to take such precautionary measures for the safety
of his servants as he owed to them, and was in duty bound to
observe, so as to provide for their safety and for them a place, as
reasonably safe, as was consistent with the nature of the under-
taking, in which to labor and attend the drills. It is the duty
which the master owes to every servant to provide a reasonably
safe place in which to work, and although he is not an insurer
he is bound on the same principle by the law to exercise due and
proper care in this regard, as he is in hiring competent servants,
or in supplying reasonably safe machinery or other instrumen-
talities for the use of his servants.

This is regarded as a personal or absolute obligation. And
if the discharge of this obligation is intrusted to a servant, such
servant is the representative of the master, and any negligence
on his part is the negligence of the master.

The servant has a right to rely on the master's performance
of this duty, and his omission to take due care in this respect,
whereby injury results to his servant, will be included among
the risks which he assumes, and for which he is liable; and
while he is not an insurer of their safety, he is not at liberty to
neglect all care; he must use due and reasonable care, according to
the exigencies of the undertaking. The obligation not to expose
the servant to perils which by proper diligence may be guarded
against becomes more important, and the degree of diligence
and care to be exercised in its performance the greater in pro-
portion to the dangers which may be encountered. (*Houck* v.
*Railway Co.* 100 U. S. 214; *Darrigan* v. *Railway Co.* 52 Conn.

306.) The duty, therefore, is affirmative and active to take such, or to adopt such precautionary measures as the proper and reasonably safe conduct of the business requires to avoid accident. Now, the evidence shows that the defendant intrusted the work of blasting and using dangerous explosives in charge of Cosgrove, and placed the men under his control, and subject to his orders for the execution of that work. In this respect he exercised supervision over the work, managed and controlled the use of the explosives, directed the place where the machinery and drills should be applied and used, and where and how the men should work.

It appears that after an explosion in the work of blasting the benches and floor of the tunnel would be covered with broken rock and debris, and that the work of the shift or gang of men that came on was to clean out the debris, drill holes, charge them with giant powder, and explode it, etc.; that if any holes thus charged failed to explode, it was impossible to discover and locate them until such broken rock and debris had been removed, and that if the drills with the force applied to them should penetrate any of such unexploded holes, it would cause an untimely explosion, and necessarily occasion great injury to the men, and probably a great loss of life. Under these circumstances it was plainly a duty, and absolutely essential to avoid exposing the men to unreasonable risks in the course of the work in which they were engaged, that so much of the rock should be cleaned away before the drilling began as would expose any missed or unexploded holes, or as would enable them to be discovered and located, so that the charge might be withdrawn, or other thing done to render them harmless, and the drilling and other work go on with comparative safety or no other danger than was incident to its precaution. The defendant was not personally present, nor did he promulgate or establish any suitable or needful rules or regulations for the safe and proper conduct of the work; and as the direct management of the work during his turn was placed in charge of Cosgrove, there necessarily devolves upon him the duties in this particular which the defendant owed to his servants. It was, therefore, the plain

XVI. Or.—34.

duty of Cosgrove to provide for the safety of the servants under his control and subject to his commands, by the exercise of such care in the management and conduct of the business intrusted to him as would render reasonably safe the place in which the men must apply the machinery and do their work.

There is nothing in the evidence to show that he took any such care, or took any such precautions as the nature of the business and his duty to the servants required. Instead of putting the men at work to clean up the debris and broken rock which covered the benches and floors of the tunnel for the purpose, *first,* of discovering and finding out whether there was any unexploded holes, and uncharging them so that the place in which the men must work with the drills and do other work would be safe from penetrating a magazine in which lie stored and concealed a box of giant powder, he put them to work in cleaning up the debris only for the purpose of getting a clean place to operate the drills, and when this was accomplished, the drills were started at once, without regard to missed holes, or the dangers which lie buried under broken rock beneath their feet, but which would have necessarily been exposed by its removal. "Nobody could tell that there was any missed holes because there was so much rock," and "we had no chance to examine for missed holes until the rock was taken off." "He did not give us time to clean up and see if there were any missed holes," and so on the evidence runs. Had the foreman exercised only reasonable care and diligence, took a precaution that it would seem the plainest dictate of humanity would require for the safety of the men in the work in which they were engaged, the missed hole must have been exposed, and this dreadful death-dealing explosion avoided. Cosgrove himself testifies that "he supposed it was safe; that there was a good deal of broken rock," etc.; but this has reference to when he entered the tunnel with his shift of hands, and when nothing had been done to clear away the debris. There is nothing in the evidence to show that he did anything then or afterwards which would make it as he supposed it was safe. It is the duty of the master not to expose the servant in performing his duties

to hazards or perils which may be guarded against by proper diligence. (*Houck* v. *Railway Co.* 100 U. S. 213.) He is bound to observe that degree of care which prudence and that exigency of the situation or the nature of the work may require, to furnish reasonably safe instrumentalities or place in which to work to avoid danger.

"Though we have said," justly remarked Baron Alderson, "that a master is not generally responsible to a servant for an injury occasioned by a fellow-servant, while they are acting in a common service, yet this must be taken with the qualification that the master shall have taken due care not to expose his servants to unreasonable risks." (*Hutchinson* v. *Railway Co.* 5 Ex. 348.) "It was held by this court," said Carpenter, J. (*Wilson* v. *W. L. Co.* 50 Conn. 433), "that a master was bound to provide for his servant a reasonably safe place for his work and reasonably safe appliances. An application of this principle to a railroad would require it to keep its road-bed, rolling stock, and implements in a good and safe condition, to adopt rules and regulations adapted to its business, so as to guard against accidents. In short, all employees shall be vigilant in the use of means and the adoption of measures to make the servants in their employ reasonably safe. To that extent the master assumes the risk." (*Durrigan* v. *Railroad Co. supra; Railroad Co.* v. *McKenzie,* 81 Va. 73.) "Indeed," said Mr. Justice Fields, "no duty required for the safety and protection of his servants can be transferred so as to exonerate him from such liability." (*Railroad Co.* v. *Herbert,* 116 U. S. 646.)

In *Railroad Co.* v. *Moore,* 29 Kan. 633, the court say: "In all cases at common law a master assumes the duty toward his servant of exercising reasonable care and diligence to provide the servant with a reasonably safe place at which to work." And again in *Railroad Co.* v. *Fox,* 31 Kan. 596, it is said: "One of the exceptions to the general rule at common law, that the master is liable to one employee for the negligence of another employee in the same service, arises from the obligation of the master, whether a natural person or a corporate body, not to expose the servant, when conducting the master's business, to

hazards or perils against which he may be guarded by proper diligence on the part of the master. If it were otherwise, the master would be released from all obligation to make reparation to an employee in a subordinate position, for an injury caused by the wrongful conduct of the person placed over him, whether they were fellow-servants in the same common service or not." And finally, in *Fraker* v. *Railroad Co.* 32 Minn. 54, the court say: "It is the duty of the master to establish and promulgate suitable and needful regulations for the safe and proper conduct of its business. And there are duties which belong to the master, as such, and in the performance of which he is bound to exercise such diligence for the protection of his employees, and if they are performed through an agent of whatever grade, he must be deemed to represent the master, and the latter is accordingly responsible for their negligent performance."

This is the language running all through the authorities upon this subject, and from these and others, to which reference might be made, the principle is fully established that it is the duty of the master, or the person who represents him, to use reasonable care and diligence and make reasonable provision for the servant's safety, and if he fails to do this he is responsible for the injury sustained as the result of his own or the agent's negligence, unl there was contributory negligence. It was, therefore, the dut, of the defendant to make such needful rules for the conduct of the work, or take such precaution as would provide for the safety of the men under the direction and control of Cosgrove as would not expose them to unreasonable risks or dangers in the performance of their duties. As a consequence, it was the duty of the defendant to protect them from the dangers of unexploded holes while engaged in their employment, as without such protection they would be constantly liable to imminent perils. As we have shown, if the reasonable precaution had been taken to remove the debris and broken rock, the unexploded hole which occasioned the injury must have been exposed and discovered, and the disastrous explosion avoided; but the defendant made no provision for these matters.

In the execution of the work and the control of the men he

left everything to Cosgrove, and necessarily the adoption of such measures as would protect them while engaged in their work. He was thus not only the foreman to direct the work of the men under him, but the person above all others to provide that they should have a reasonable safe place at which to work, with reference to its risks and exigencies, and consequently it became his duty to be vigilant in the use of such means as would guard them from the dangers of unexploded holes. In this view, it is of no importance by what name Cosgrove be called, whether middle-man, superintendent, or foreman. The truth is, as was said by the Supreme Court of North Carolina, that so variant were the relations between master and servants in different employments, and so close the line of demarkation between co-laborers and middle-men, that each case would have to stand upon its own facts.

We think, therefore, when Cosgrove ordered the plaintiff to set up the machinery, and to drill holes at the place where the injury happened, without having taken some care, or at least taken some precautionary measures to discover whether there were holes which had failed to explode, and to guard against the dangers of the drills penetrating them, he committed a wrongful and negligent act, and exposed the plaintiff to a serious danger not contemplated by his contract of service. In saying this we are not unmindful that the defendant is not an insurer; but we are mindful that he is not at liberty to neglect all care, but that he must use due and reasonable care. As a result we do not think Cosgrove was a fellow-servant, nor that there was error in the instruction.

The judgment must be affirmed.