THE PIONEER.

In re SIMPSON et al.

(District Court, N. D. California. February 5, 1897.)

No. 11,226.

1. MASTER AND SERVANT—DANGEROUS APPLIANCES—FELLOW SERVANTS.
A shipwright, at work in the hold, while necessarily going on deck by the forward hatchway ladder for purposes connected with his work, was struck on the head, as he emerged from the hatchway, by a barrel of cement, which was being swung in from the rail to be lowered into the hold, and was knocked from the ladder into the hold, and severely injured. A guy rope attached to the barrel was held by the mate, but he was looking in another direction at the time, and no warning was given. A general warning had been given at the hatchway when the loading began in the morning, but it was doubtful whether the shipwright was in position to hear it. *Held*, that no question of fellow servants was involved, but the case was one of breach of duty by the master to see that the places where his servant was compelled to go in the discharge of his duties were reasonably safe.

2. SAME—DUTY TO WARN OF DANGER.
An employer does not discharge his duty in keeping a place reasonably safe by giving warnings of threatened danger, when the employé charged with the duty of giving the warnings, is so engrossed with other duties that he cannot properly and efficiently give the warnings.

3. DAMAGES—PERSONAL INJURIES.
$5,000 allowed to a shipwright, 48 years old, in good health, married, and earning $94 to $96 per month, for permanent injuries which destroyed the hearing of one ear, impaired his muscular sense, and rendered him incapable of doing any but light work.

This was a petition by A. M. Simpson and others, owners of the American schooner Pioneer, for limitation of their liability in respect to a claim by Robert Lynas for personal injuries sustained while engaged as a shipwright in making repairs to the schooner.

Brewton A. Hayne, for petitioners.
C. H. Fairall, for respondent.

MORROW, District Judge. This is the usual proceeding, under sections 4282–4285 of the Revised Statutes and the rules of the supreme court of the United States made thereunder (Gen. Adm. Rules 54–58), to determine and limit the liability, if any there be, of the owners of the American schooner Pioneer for certain injuries alleged to have been sustained by one Robert Lynas, while employed on said schooner. Lynas instituted, on November 25, 1895, an action in the superior court of the city and county of San Francisco, state of California, against the petitioners in this proceeding and one G. T. Morse, to recover damages in the sum of $50,000 for certain injuries alleged to have been sustained by and through the negligence of the petitioners and G. T. Morse. It seems that the latter person was also a part

owner of the schooner, and that he has died since the institution of these proceedings. Thereafter, on January 27, 1896, the petitioners, desiring to avail themselves of the benefits of the limitation of liability act, filed in this court a petition for a limitation of their liability as owners of the schooner. Testimony was taken before the commissioner of the court as to the value of the schooner. The report of the commissioner showed that he found that the appraised value of the schooner, on the 25th day of August, 1894, the date of the alleged accident to Lynas, was the sum of $12,000, and that no freight was pending on the schooner at that date. This report was confirmed by the court, no objection being made thereto; and subsequently a bond was given in the appraised value of the vessel. The usual monition was issued, directed to said Robert Lynas and his attorneys, and to all persons claiming damages for any and all loss, damage, or injury, caused by or resulting from the accident to said Robert Lynas in said petition mentioned, citing them to appear before Southard Hoffman, United States commissioner, and make due proof of their respective claims, at or before a certain day named in the writ, not less than three months from the issuing of the same, and also at said time to appear and answer the petition. The usual injunction was also issued restraining and enjoining the said Robert Lynas and his attorneys from the further prosecution of said suit in the superior court of the city and county of San Francisco, state of California, and all and any suits against said petitioners, or either of them, in respect to any claim for loss or damages occasioned, incurred or arising out of or in consequence of the accident to said Robert Lynas on the said schooner Pioneer as in said petition and the complaint in said action in said superior court alleged, either in the courts of the state of California, or in the United States courts, or elsewhere. Subsequently, on the 18th of March, 1896, the attorneys for Robert Lynas filed a motion and notice of motion to dissolve the injunction. After hearing duly had, this motion was denied. Thereafter, on June 1, 1896, Lynas filed, in this court, his claim for damages against the petitioners, and, on July 26, 1896, he filed his answer to the allegations of the petition. Upon the issues as thus made, testimony was taken and the case was submitted to the court for decision on November 13, 1896.

The salient facts of the case are as follows: The schooner Pioneer, owned by the petitioners, was lying, on the 25th of August, 1894, in the Bay of San Francisco, alongside a wharf or dock near Fourth and Channel streets, and, at the time the respondent Lynas was injured, was being loaded with barrels of cement or lime. The schooner lay with her port side to the wharf. The respondent Lynas was then in the employ of the owners of the vessel as a ship carpenter, engaged between-decks in making certain repairs in the forward hold of the vessel. These repairs consisted, for the most part, in strengthening the knees of the schooner, and refastening the ceiling, as far as it could be done, with big spikes. While engaged in this labor, with several other shipwrights, it was necessary for the respondent to come up on deck in order to cut pieces of iron into bolts of the desired length. This portion of the work could not be done

conveniently in the hold, on account of the floor being covered to a considerable extent with railroad ties, part of the cargo of the schooner. The pieces of iron referred to were located on the deck forward of the forward hatch. The respondent says they were on the starboard side of the vessel, while the captain states that they were more to the center of the deck. It was while coming up on deck through the forward hatch, on a ladder placed there for that purpose, in order to cut the pieces of iron into bolts of the proper length, that the respondent, just as he was emerging from the hold above the hatch coaming, was struck by a swinging barrel on the side of the head with such force that he was knocked down the hatch, falling a distance of about eight feet, fracturing his spine and skull, and otherwise being severely injured and bruised. The only practical method of getting on deck was by means of the ladder placed in the forward hatch. The size of this hatch was about 11x12 feet, and the ladder was about 18 inches wide, and rested, at the top, against a beam at the after side of the hatch, and was placed rather to the starboard side of the hatch. The beam against which the ladder rested ran across the hatch,—that is, athwartships,—and was about 18 inches below the deck. The respondent testified that the ladder was on the starboard side of the fore hatch; that sometimes it was right close against the starboard hatch coaming and at other times it was probably three or four inches off, or might have been a foot off; sometimes they would have to move the ladder around in the bottom; they used to change it a little, so as to get the barrels to roll around; it had quite a good slant. Witnesses for the petitioners testified on direct examination that the respondent could have reached the deck through the main hatch, but they had to admit, on cross-examination, that egress and ingress through the main hatch was impracticable, and this for the reason that the approach to this hatch was inconvenient and difficult, as there were several tiers of barrels stowed between the forward and main hatches. The first mate admitted that, in order to reach the main hatch, it would be necessary to crawl over the barrels. The evidence on this point shows clearly and beyond any doubt that the ladder in the fore hatch was the only convenient and practicable avenue of egress and ingress from the deck to the forward hold. In the language of the captain of the schooner: "The ladder was put down there to go up and down on. Mr. Lynas and the rest of the crew that were working used that ladder to go up and down on that morning." Upon the morning in question, the loading of barrels of cement had been going on from about 7 o'clock, and, according to the testimony of the second mate, some 30 or 40 barrels had been loaded prior to the accident, which happened about 8 o'clock, probably after 8 o'clock. The loading was being carried on across the port side of the vessel into the forward hatch. It appears from the testimony of the respondent that he had been told by the captain of the schooner, also a part owner and one of the petitioners, that he would not be interfered with in his work in the fore hold by the loading that was going on, and he had been urged to expedite his labors as much as possible so that that part of the hold might be utilized for stow-

ing purposes. The manner of loading consisted in rolling a barrel, on a plank from the wharf, up onto the rail of the vessel on the port side, when a strap was placed around the barrel, and a hook onto it with what is known in nautical parlance as a "single Spanish burton." By this means the barrel was hoisted. A guy rope was also attached to the barrel, the purpose of which was to steady the load, and control the swing of the barrel from the rail to the hatch. The barrel would be hoisted from the rail, and would swing in over the hatch coaming, when it would be lowered into the hold. The first mate and a man who assisted him attended to the loading on deck; the former handling the guy rope, and the latter doing most of the hauling on the burton, to raise the barrel from the rail. The second mate was stationed, as stated, in the hold at the fore hatch, to receive the barrels as they were lowered into the hold. The first mate testified that he often helped the man raise the barrel from the rail, and that when he did so he would make the guy fast to the rail, and, when a barrel had been swung over the hatchway, he would turn and go to the hatch. So far as the evidence discloses, the first mate and the man who assisted him were the only persons on the deck who managed the hoisting and swinging of the barrel over the hatchway after it had reached the rail. The captain testified that he had general supervision of the loading, but that the first mate had immediate charge of it. The dangerous feature of the loading to one coming up the ladder, as developed by the evidence, consisted in the swing of the barrel over the port side of the vessel from the rail to and over the hatchway; that is, it was dangerous to one who had not been warned that a barrel had, or was about to be, swung over and into the hatch. This danger was increased by the further fact that the swing of the barrel could not be stopped immediately. The barrels weighed about 300 pounds. The distance from the rail to the hatch was about 12 feet, while the guy rope was some 25 or 30 feet long. The danger of being struck by a swinging barrel, not only to one coming up the hatch unwarned, but to any one who might happen to be on the deck on the port side, and in the way of the barrel, is established by the testimony of the captain himself. He said: "If you are swinging in cargo over the port side, it is naturally dangerous. * * * When a barrel of cement swings in from the rail, you cannot fetch it up just in a minute, and it is bound to hit him." In reply to the question, propounded on cross-examination: "If you had hold of that guy rope, and were looking towards the hatch, could you not have stopped its swing at any moment?" he answered: "Not exactly; no, sir. Because it would swing in to the edge of the hatch coaming before you could; that is, pretty well in." He further testified as follows: "Q. Do you mean to say that if a man had hold of the guy rope, and from the time the barrel began to swing, that it would not be at all times under his control, so that he could stop it at any moment? A. He could stop it within a few feet. Q. Could he not stop it at any moment he saw fit, if he had perfect control over it? A. No, because it has got to swing off the rail. He could not stop it on the rail after it goes. * * * Q. If you had hold of that barrel at the beginning, could you not ease it

off, and stop it anywhere? A. It is impossible to do it where you are hoisting in cargo like that. When you hook onto this strap your guy does not come right straight with the rail; it has got a slant. A 300 pound barrel of cement is going to swing before you fetch it up. Q. How far will it swing? A. I should say is would swing four or five feet before you can fetch it up. Q. How far would it be from the edge of the coaming of the hatch,—four or five feet? A. That would be ten feet."

Under the above state of facts, two questions are presented to the court for its determination: (1) Whether or not there was any negligence on the part of the petitioners, their agents or servants, in the loading of the barrel of cement which struck the respondent; and (2) whether the petitioners, or any of them, had any privity or knowledge of the negligence, if it should be determined that there was any, which would make them personally liable. It is contended by respondent that the negligence consisted in the fact that he received no warning of the proximity of the swinging barrel which struck him; and, further, that the machinery and appliances used in hoisting and lowering the barrel, which struck him, were negligently and carelessly prepared, handled, and operated. On behalf of the petitioners it is contended that full and adequate warning was given, and that the appliances used for loading were properly prepared, handled, and operated, and that the accident to the respondent arose by reason of his own negligence in attempting to pass forward on the port side of the vessel, across which barrels were swung from the rail to the hatch, and as to which, it is claimed, he had been repeatedly and seasonably warned. I hardly think that the respondent has established that there was anything wrong or defective in the machinery or appliances used in loading. Some testimony was introduced on behalf of respondent for the purpose of showing that there was no guy attached to the barrel which struck the respondent; but this testimony will hardly justify such a conclusion. The witness, who testified that he rushed on deck immediately after the accident and that he did not see any guy rope, admitted that he was considerably excited at the time. On the other hand, the witnesses for the petitioners all agree that there was a guy rope on this particular occasion, the first mate swearing that he handled it himself. This ground of negligence will therefore be dismissed without further consideration.

Before disposing of the other ground of negligence urged, viz. the failure to give sufficient and timely warning, it is important to ascertain where Lynas was at the time he was struck by the barrel. The determination of this fact necessarily involves the question as to whether or not the respondent was guilty of contributory negligence in being in a place in which he should not have been at the time he was injured. In this connection it is claimed by the petitioners that the respondent, when he was struck, had stepped on deck from the hatchway, and, instead of passing directly forward by the starboard side, had taken the longer course by the port side—the dangerous side—of the vessel; and that he

had been cautioned not to attempt to pass on that side while the loading was progressing, in view of the imminent danger of being struck by the barrels as they were swung from the rail, across the port side, over to the hatch. The respondent positively and unequivocally testified that he was still on the ladder when he was struck; that he was going up the ladder; that when he was struck his head and body had emerged about $2\frac{1}{2}$ or 3 feet above the deck; that his feet were still on the ladder. None of the witnesses in the case pretend that they saw the respondent at the time he was struck, although the second mate says he saw him just before he was hit, and several of the other witnesses saw him immediately after he fell into the bottom of the hold. The second mate testified that he was engaged in receiving the barrels as they were lowered into the forehatch; that he noticed the respondent go up and come down once before he was hurt; that he saw him go up the time he was struck by the barrel; that he saw his whole body until he disappeared from the ladder; he saw him step off the ladder, but did not see him step off the beam, against which the ladder rested. He admits that he was not exactly watching the respondent, and that he could not swear where he stepped to. The beam referred to was, as previously stated, about 18 inches below the hatch coaming. So that, assuming that the testimony of this witness is accurate, the respondent would still have had to step from the beam onto the deck, when the second mate last noticed him. The first mate, who was supervising the loading on deck, and personally handled the guy rope, admits that he did not see the respondent when he was hit by the barrel; that he (the first mate) was looking away from the hatch at the time. It appears that he did not even know who it was that had been hit by the swinging barrel until he looked into the hold, and saw the respondent lying unconscious at the bottom. This testimony, in my opinion, is not sufficient to outweigh the positive and unequivocal testimony of the respondent Lynas that he was still on the ladder when he was struck. Besides, the inherent probabilities of the situation tend to support the statement of the respondent that he was on the ladder, and not on the port side of the schooner. In the first place, the pieces of iron, which the respondent had to cut to the proper length, and the place where they were being cut, were forward of the fore hatch, rather to the starboard side. It is conceded that, as the ladder was on the starboard side of the hatch, the shorter distance from the ladder to the spot, where the pieces of iron were, was by going forward on the starboard side of the vessel, and not by the way of the port side. It was further testified that the starboard side was clear. Now, it is highly improbable that the respondent should have taken the longer and more dangerous way around to reach the desired spot forward of the fore hatch; particularly so if he had been warned, as testified to by the first mate, that the port side was the dangerous side. In the second place, it would seem probable that if the respondent, as claimed, was actually passing from the ladder along the inshore or port side of the vessel, he would have noticed this 300 pound

barrel in time to get out of its way. Another significant fact, which tends to show that the testimony of the respondent that he was still on the ladder when struck is true, is that the rail from which the barrel was swung was about three feet above the deck. As testified, the barrel was swung from this rail, and was raised just a trifle to give it a swing. The respondent testified that his head was about 2½ or 3 feet above the deck when he was hit, and that he was struck on the right ear. This would place his head directly in line with the barrel as it swung from the rail to and over the hatchway. On the other hand, had he been struck by the barrel while he was passing forward on the port side of the deck, the injury would have been on some lower part of his person. The petitioners meet this aspect of the case with the theory that the injury, which the respondent received on his head, was not from the barrel, but from the fall into the hold of the vessel; that the swing of the barrel merely pushed him over, and he fell into the hatchway; and that the injury was the effect of his fall head downwards on the railroad ties at the bottom of the hatchway. In my opinion, the serious injury he received was not of such a character as to be satisfactorily explained in that way. The injury was on the right side of the head, indicating a concussion from the effect of a side blow, but not from the effect of a fall, which would necessarily have involved other parts of the body. I conclude, therefore, that the respondent was still on the ladder when he was struck by the barrel, and that, as testified by him, the upper part of his body had emerged above the deck some three feet.

We now come to the question whether the respondent received any warning, and, if so, whether it was an adequate and a seasonable warning. The respondent testified that he received no warning of any sort from the first mate or any one else connected with the loading. It is true that one of his physicians testified that he had an impairment of hearing previous to the accident, and, as a direct result of the injury, he had lost entirely the hearing of the right ear, but it nowhere appears from the evidence that such impairment of hearing, as there was, seriously affected the respondent's ability to hear any warning that may have been given, provided he were within ordinary hearing distance. But, aside from this, the respondent is corroborated by three witnesses, all of whom were shipwrights engaged in working with the respondent in the forward part of the hold that morning. They all testify that they heard no warning. An attempt was made to contradict these witnesses by the testimony of the captain, first and second mates. But their testimony, at the most, simply amounts to this: that a general warning was given by the first mate when the loading commenced, or, to use the words of the second mate, the first mate came to the hatch, and "sang out" for the men in the hold to look out when they came up the ladder. "He did not tell us personally; he sung out to everybody." It is not claimed by these witnesses that warning was given every time a barrel was swung over the hatchway, nor that on the occasion when the respondent was hit by the barrel any warning was then given. The captain admits

that the warning was not given as each barrel was swung across to the hatch. The first mate states that he simply gave a general warning, intended for everybody. The second mate, in testifying about this general warning, stated that he heard the mate's warning but once that morning, and that that was when they had started loading; that the mate was at the after part of the hatch, on deck, when he sang out; that he (second mate) was right under the hatch; that the respondent at that time was working forward. In his direct examination he stated that the mate sang out loud enough for everybody to hear; that it was loud enough to hear 20 or 30 feet off, and that the respondent was within that distance. On his cross-examination, however, he contradicts himself, and states that the respondent was about 50 feet under the deck forward. If this be true, it is clear, according to the testimony of the second mate himself, corroborated by that of the three workmen who were working in the forward hold, that the respondent could not have heard the general warning given by the mate. Another view of this matter may be that the respondent did not hear the warning claimed to have been given by the mate because he was not then on board the schooner. The testimony of the second mate is, in effect, that the mate sang out a warning but once that morning, and that that was when the loading first commenced, which was about 7 o'clock. The respondent testified that he was somewhat late that morning and does not think he reached the schooner until 7:25 o'clock. If this be so, he could not have been in the hold of the vessel when the mate sang out his general warning. This would account for the otherwise irreconcilable conflict between the testimony, on the one hand, of the respondent, and, on the other hand, of the first and second mates. But assuming, for the purposes of the case, that a general warning was given, and that the respondent had heard it, still it is undisputed that no warning whatever was given that a barrel was about to be swung off the rail over to the hatchway the time he was struck. This, under the facts of the case, was negligence and carelessness on the part of those in charge of the loading. A general warning, assuming that the respondent heard it, and repeated cautions by the mate to keep away from the inshore or port side of the vessel, were of no utility or efficacy whatever to one who was passing up and down the ladder. The respondent could not know whether a barrel was about to be swung over the hatchway, unless he were warned. He could not ascertain that fact for himself until his head had emerged above the hatchway, which was just the point of danger. This impending danger required, so long as these shipwrights were at work in that part of the hold, and their work made it necessary for them to come up on deck through the fore hatch into which the loading was going on, that means should have been taken by those in charge of the loading, either to ascertain when some one was coming up the ladder, so that those on deck might be apprised of this fact, and regulate their actions accordingly, or else some one should have been stationed at such a place near the hatch that those coming up might be properly and seasonably warned that a

barrel was about to be swung from the rail over to the hatchway. The employer owes it as a personal duty to his employés to furnish them with a reasonably safe place to do their work in. As was said by this court in Hermann v. Mill Co., 71 Fed. 853, with reference to the positive and personal character of this duty:

"It is undoubtedly true that the master assumes the duty towards his servant of providing him with a reasonably safe place in which to work; that this duty is a positive and personal one; and that, if delegated to a subordinate, it remains, nevertheless, in law, the act of the master."

The rule is clearly stated by Mr. Justice Brewer in Railroad Co. v. Baugh, 149 U. S. 368, 386, 13 Sup. Ct. 914, 921, as follows:

"A master employing a servant impliedly engages with him that the place in which he is to work, and the tools or machinery with which he is to work or by which he is to be surrounded, shall be reasonably safe. It is the master who is to provide the place and the tools and the machinery, and when he employs one to enter his service he impliedly says to him that there is no other danger in the place, the tools, and the machinery than such as is obvious and necessary. Of course, some places of work and some kinds of machinery are more dangerous than others; but that is something which inheres in the thing itself, which is a matter of necessity, and cannot be obviated. But within such limits the master who provides the place, the tools, and the machinery owes a positive duty to his employé in respect thereto. That positive duty does not go to the extent of a guaranty of safety, but it does require that reasonable precautions be taken to secure safety; and it matters not to the employé by whom that safety is secured, or the reasonable precautions therefor taken. He has a right to look to the master for the discharge of that duty; and if the master, instead of discharging it himself, sees fit to have it attended to by others, that does not change the measure of obligation to the employé, or the latter's right to insist that reasonable precaution shall be taken to secure safety in these respects. Therefore it will be seen that the question turns rather on the character of the act than on the relations of the employés to each other. If the act is one done in the discharge of some positive duty of the master to the servant, then negligence in the act is the negligence of the master."

See, also, Hough v. Railway Co., 100 U. S. 213; Railroad Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590; Mullin v. Horseshoe Co., 105 Cal. 77, 38 Pac. 535, and cases there cited; Eingartner v. Steel Co. (Wis.) 68 N. W. 664; Anderson v. Bennett (Or.) 19 Pac. 765; McKinney, Fel. Serv. 73, § 28; Wood, Mast. & Serv. 695, § 334; Shear. & R. Neg. (3d Ed.) p. 119, § 92; 7 Am. & Eng. Enc. Law, 830, and cases there cited.

Applying this doctrine to the facts of the case at bar, it is evident that the forward hatchway was not a safe place, within the meaning of the rule, when an employé, while going up the hatchway, in the course of his employment on the vessel, was liable to be struck by a barrel swung over the hatchway, preparatory to its being lowered into the hold. That it was necessary for the respondent, in the course of his employment, to use the ladder in the forward hatch for the purpose of going up on deck and cutting the pieces of iron into bolts of the proper length, is affirmatively established by the evidence; and that those in charge of the loading were fully aware of and appreciated this fact is also clearly established. Some adequate provision should therefore have been made to protect the respondent from the danger that threatened him in the progress of his work. The evidence justifies the inference that not even a

lookout was kept on the hatchway, to see that no one emerged from the hatch while a barrel was being swung over to the hatchway. If the mate was so engaged in supervising and assisting in the loading that he could not personally give proper and timely warnings, another person should have been assigned to perform that function. The employer does not discharge his full duty, in keeping a place reasonably safe by giving warnings of threatened or impending danger, when the employé, charged with the duty of giving the warnings, is so engrossed and busied with his other duties that he cannot properly and efficiently give the necessary warnings. Hermann v. Mill Co., supra; Cheeney v. Steamship Co. (Ga.) 19 S. E. 33. The case of Hermann v. Mill Co., supra, while referring to and approving of this doctrine, is to be distinguished, as to the facts, from the case at bar. In the case cited I held that the employer had fully discharged his duty to his servant, so far as a safe place to work in was concerned, when he had furnished a competent person, unhandicapped by other duties, to give the warning signal.

In the view taken by the court, no question of the negligence of a fellow servant can arise in this case. The injury to respondent, under all the facts of the case, arose by virtue of the breach on the part of his employers, the petitioners, of a personal duty which they impliedly owed him, to see to it that the places on the vessel in which he was compelled, in the course of his employment, and by reason of the nature of his duties, to proceed to and from, should be reasonably safe and free from danger; and, having failed to fully and properly discharge this personal duty, it is such negligence as entitles the respondent to recover for the damages he proximately sustained thereby.

As the damages to be allowed will not, in any event, exceed the sum of $12,000, the appraised value of the schooner Pioneer, it is unnecessary to consider whether or not the petitioners, or any of them, had any privity or knowledge of the breach of duty or negligence which would render them, or any of them, personally liable to the respondent.

We come now to the question of damages. The respondent, at the time he was injured, was 48 years of age; was a married man; enjoyed good health; was a shipwright by trade, and earned from $94 to $96 a month. He had been continuously employed for the past eight years. He was injured on the morning of August 25, 1894. Since that time he has not been able to work, except to do a little light work for a few hours. That he was severely injured is patent from the testimony of the two physicians who attended him. Dr. William P. Simpson, who was at the Receiving Hospital of the City and County of San Francisco when the respondent was brought there immediately after the accident, testified that "he was brought to the Receiving Hospital in an unconscious condition; hemorrhage from both ears; contusion at the base of the head; and he was unconscious." Dr. William B. Church testified that he was a regularly licensed physician and surgeon of the state of California; that he had practiced about thirty years; that he knew

78 F.—39

the respondent for two years before he was injured; that he had been under his care for the past two years or thereabouts; that he saw him on Sunday morning, the next day after the accident; that he had him removed to his sanitarium on Jackson street, Oakland; that previous to the accident he knew the respondent to be a robust, vigorous, sound man; that his physical condition, at the time he testified (November 10, 1896), was one of partial physical disability; that he suffers from a partial impairment of the muscular sense,—that is to say, that sometimes he cannot tell whether he has hold of anything or not; that, by reason of this disability he cannot do work requiring special dexterity or nicety of manipulation; that his nervous condition is impaired; that he cannot control his emotions; that there was some impairment of hearing prior to the accident, but, as a direct result of the injury, he has lost the hearing entirely of his right ear; that he is unable to do hard manual labor, though he can perform light work; that, in the doctor's opinion, he will never be able to perform hard manual work again. To fix the quantum of damages, in cases of this character, is a question always more or less embarrassing. The court cannot arrive at an exact or precise determination; it can fix the damages only approximately. The verdicts of juries take a wide range, and afford but little assistance to the court. The general rule laid down by the text-books and authorities as to the measure of damages is that "in an action for negligent injury to the person of the plaintiff he may recover the expense of his cure, the value of the time lost by him during his cure, and a fair compensation for the physical and mental suffering caused by the injury, as well as for any permanent reduction of his power to earn money." Shear. & R. Neg. (3d Ed.) § 606; 14 Am. & Eng. Enc. Law, 915. In view of all the circumstances of the case, I shall allow the gross sum of $5,000 as damages. A decree therefor will be entered, with costs.