[Filed January 6, 1891.]

EMMA MILLER, ADMINISTRATRIX, *v.* SOUTHERN PACIFIC CO.

MASTER AND SERVANT — MASTER'S DUTY CANNOT BE AVOIDED BY DELEGATION.—Any duty which the master is required to perform for the safety and protection of his servants cannot be delegated to any servant of any grade, so as to exempt the master from liability to a servant who has been injured by its non-performance.

CARE REQUIRED OF RAILROAD COMPANY — INSPECTION OF TRACK — SAFETY OF EMPLOYE.— It is the duty of a railroad company to keep its road-bed and track, rolling stock, machinery and appliances in good and safe condition; to cause as frequent and thorough inspection of these as can be done consistently with the conduct of its business, for the purpose of discovering any defects that may occur from accidental causes, or the effects of wear and tear, or the progress of decay; to exercise care in the selection of its servants, and in their retention in its service; and to adopt such rules and regulations as are calculated to guard against accidents, and to make the servants in its employ reasonably safe.

SWITCHMAN — DUTY TO NOTIFY COMPANY.—It is the duty of a switchman to operate the switch, and see that it properly adjusts the rails, so that the trains may pass with safety. The act he performs involves no duty of construction or repair, or other duty in regard to the switches of the road, if out of repair, or unfit for use, whether by wear or tear, or by the criminal interference of strangers, than to promptly notify the company of its condition, so that it may be repaired, or its place supplied.

LAW AND CONTRACT — REGULATIONS.—It is the law, in the absence of express contract, that establishes the relation of the parties, creating him agent or representative of the master who performs duties which the law itself makes it incumbent on the

master to perform, and not the rules or regulations of the company designed for the guidance of its servants, and to secure reasonable safety in the conduct of its business.

FELLOW-SERVANT'S RISK.—The co-operation of the switchman is necessary to the successful management of the trains, and employes upon the train in the common service assume the risk of the negligent discharge of his duty.

TRESPASS BY STRANGER.—Where the trial court refused to admit as evidence the indictment and judgment of the conviction of one W. A. Hill for the killing of the plaintiff's intestate by disarranging a switch on the defendant's railroad, and certain confessions he had made to one Dr. Davis, upon the ground that such evidence was *res inter alios acta; held,* no error.

Marion county: R. P. BOISE, Judge.

Defendant appeals.    Reversed.

*E. C. Bronaugh*, for Appellant.

A railroad company is not, as toward its employes engaged in operating its trains, an insurer of the safety or soundness or proper condition of repair of its track or switches, but is only liable to them for such defects therein as it knew, or by the exercise of such reasonable care might have known, to exist, and might by such care have prevented or remedied. (2 Rorer on Railroads, 834, 1200; Pierce on Railroads, 370; *Elliott* v. *St. Louis, etc. R. Co.* 67 Mo. 272; *Columbus, etc. R. Co.* v. *Troesch*, 68 Ill. 545, 18 Am. Rep. 578.)

And in any event, a railroad company is not liable, when it uses due care, for a mistake of judgment in the choice of machinery and mode of constructing the road. (Pierce on Railroads, 371, 372, 373; *King* v. *Boston, etc., R. Co.* 9 Cush. 112; *Ladd* v. *New Bedford R. Co.* 119 Mass. 412, 20 Am. Rep. 331; 2 Rorer on Railroads, 1199.)

Nor is there any evidence tending to show that the appellant knew the switch to be out of order, unless, if the switch had been tampered with before the Lebanon locomotive passed through it, Huston was negligent in not discovering the fact, and he stood in the relation of vice-principal to Miller, so that his negligence was the negligence of appellant. (2 Rorer on Railroads, 1198, 1199; *Greenleaf* v. *Ill. Cent. R. Co.* 29 Iowa, 14, 4 Am. Rep. 181; *Wonder* v. *Balt. & Ohio R. Co.* 32 Md. 411, 3 Am. Rep. 143; 3 N. Y. S. 585; 6 N. Y. S. 605.)

The employes of a railroad company engaged in operating one of its trains are fellow-servants of employes of the

same company engaged in operating another of its trains; and both are fellow-servants with another employe whose duty it is to repair track; and if one of such employes be injured through the negligence of the other, the company is not liable for such injury.   (McKinney Fel.-Serv. § 141, p. 307 and p. 282; 2 Thomp. Neg. 1037, 1038; 2 Rorer on Rail-roads, 1193 to 1197; Pierce on Railroads, 361, 362; *Manville* v. *Cleveland & T. R. Co.* 11 Ohio St. 417; *Pittsburg, etc. R. Co.* v. *Devinney,* 17 Ohio St. 197; *Michigan Cent. R. Co.* v. *Dolan,* 32 Mich. 510; *Hayes* v. *Western R. Co.* 3 Cush. 270; *Louisville, etc. R. Co.* v. *Robinson,* 4 Bush. 507; *Slatterly* v. *Toledo, etc. R. Co.* 23 Ind. 81; 8 Am. and Eng. Ry. Ca. 171 and p. 150; 112 U. S. 377; 23 Blatchf. 422; 63 Wis. 91; 33 Minn. 218; *Boldt* v. *N. Y. etc. R. Co.* 18 N. Y. 432; *Coon* v. *Syracuse, etc. R. Co.* 5 N. Y. 492; *Toner* v. *Chicago, etc. R. Co.* 69 Wis. 188, 31 N. W. Rep. 104; *Gaffney* v. *N. Y., etc., R. Co.* 15 R. I. 546, 7 Atl. Rep. 284; 26 Fed. Rep. 837; 141 Mass. 564; *Van Wickle* v. *Manhattan R. Co.* 32 Fed. Rep. 278, and p. 893; *Naylor* v. *N. Y. Cent., etc., R. Co.* 33 Fed. Rep. 801, and 35 Fed. Rep. 40; *McKaig* v. *Northern Pac. R. Co.* 42 Fed. Rep. 288, and 39 Fed. Rep. 19, 20; *Van Avery* v. *Union Pac. R. Co.* 55 Fed. Rep. 40; *Randall* v. *Railroad Co.* 109 U. S. 478; *McMaster* v. *Ill. Cent. R. Co.* 4 So. Rep. 59; 60 Miss. 977; 67 Ala. 206; 35 N. W. Rep. 582.)

Nor did any rule of the company operate to change this well-established principle. (*Louisville, etc., R. Co.* v. *Martin,* 87 Tenn. 398, 10 S. W. Rep. 772; *Leubke* v. *Chicago, etc., R. Co.* 63 Wis. 91, 53 Am. Rep. 266.)

In order that the master shall be held liable to one of his servants for the neglect or failure of another of his servants to perform a duty imposed upon him, or the performance of which is intrusted to him, the duty must be one which the master himself undertakes or is obligated to perform in behalf of the first-named servant.  (*Anderson* v. *Bennett,* 16 Or. 524–527, 8 Am. St. Rep. 311.)

A switch-tender and a locomotive engineer are fellow-servants, and the company is not liable to the latter for the carelessness

of the former in the management of the switches or for neglect to observe its rules. (*Eicheler* v. *St. Paul Furniture Co.* 40 Minn. 263, 41 N. W. Rep. 975; *Farwell* v. *Boston & W. R. R. Co.* 4 Met. (Mass.) 49, 38 Am. Dec. 339; 2 Thomp. Neg. 924; *Slatterly's Admr.* v. *Toledo, etc., R. Co.* 23 Ind. 81; *Toner* v. *Chicago, etc., R. Co.* 69 Wis. 188, 31 N. W. Rep. 104, and 33 N. W. Rep. 433; *Gaffney* v. *New York, etc., R. Co.* 15 R. I. 546, 7 Atl. Rep. 284; *Peterson* v. *Chicago, etc., R. Co.* 64 Mich. 621, 34 N. W. Rep. 260; *Amour* v. *Hahn,* 111 U. S. 313.)

So as to an engineer and a section man engaged in repairing the company's road. (*Foster* v. *Minn., etc., R. Co.* 14 Minn. 360; *Coon* v. *Syracuse, etc., R. Co.* 5 N. Y. 492; *Whaalan* v. *Mad River, etc., R. Co.* 8 Ohio St. 249; *Murray* v. *St. Louis, etc., R. Co.* 98 Mo. 573, 14 Am. St. Rep. 661; *White* v. *Kennon,* 9 S. E. Rep. 1082; *Byrnes* v. *N. Y., etc., R. Co.* 113 N. Y. 251; *Naylor* v. *New York Cent., etc., R. Co.* 33 Fed. Rep. 801; *Randall* v. *Balt. & Ohio R. Co.* 109 U. S. 478.)

The law only requires ordinary and reasonable care from a railroad company, as to its employes, in furnishing a safe track and keeping it in repair; nor does it impose upon the company the duty of keeping some one constantly guarding its track and switches, in order to warn approaching trains if they get out of repair. (*Mackin* v. *Boston, etc., R. Co.* 135 Mass. 201, 46 Am. Rep. 456; 2 Thomp. Neg. 982; *Leonard* v. *Collins,* 70 N. Y. 94.)

The record of Hill's conviction for causing the death of Miller by wrecking the switch was *prima facie* evidence of the facts thereby established. (*Maybee* v. *Avery,* 18 John. 352; *Mead* v. *Boston,* 3 Cush. 404.)

*R. Williams* and *Charles H. Carey,* for Respondent.

The duty to keep and maintain safe instrumentalities is an absolute and personal duty, which the master cannot escape by entrusting it to an agent or servant. (*Railroad Company* v. *Ross,* 112 U. S. 377; *Flike* v. *Boston & Albany R. R.* 53 N. Y. 551; *Dick* v. *Railroad Co.* 38 O. S. 389; *L. M. R. R.* v. *Stevens,* 20 Ohio, 431; *Drymala* v. *Thompson,* 26 Minn. 40; *Bessex* v. *Chicago, etc. R. R.* 45 Wis. 477; *Pantzar*

v. *Tilly Foster Iron Mine,* 99 N. Y. 368; *Krueger* v. *Louisville, etc., Ry. Co.* 111 Ind. 51; *C. B. & Q. R. R. Co.* v. *Avery,* 109 Ill. 314; *Ford* v. *Fitchburg R. R.* 110 Mass. 240, 14 Am. Rep. 598; *Shanny* v. *Androscoggin Mills,* 66 Me. 420; *Northern Pacific R. R.* v. *Herbert,* 116 U. S. 642; *Bessex* v. *Chi. & N. W. Ry.* 45 Wis. 477; *Gilmore* v. *Northern Pacific R. R.* 18 Fed. Rep. 367; *Snow* v. *Housatonic Ry. Co.* 8 Allen, 441, 85 Am. Dec. 720; *Wedgwood* v. *Chicago & N. W. Ry.* 41 Wis. 477; *Trask* v. *Cal. Southern R. R.* 63 Cal. 96; *Hough* v. *Railway Co.* 100 U. S. 213.)

LORD, J.—This is an action to recover damages brought by the plaintiff, as administratrix of the estate of her husband, J. W. Miller, deceased, under section 371, Hill's Code, for the death of the intestate, who was killed on the night of the 28th of July, 1889, by the derailing of an engine of which he was engineer, in the employ of the defendant. His death is alleged to have been caused by the negligence of the defendant and its agents in suffering a certain switch at Lebanon Junction, on the line of the road, to be out of order, so that in operating it the rails did not form a continuous line, whereby the engine was thrown from the track and he was so badly injured that he died the next day.

After denying these facts the defendant alleges as a separate defense: (1) That the derailing of the engine was caused by one W. A. Hill, who, immediately before the engine was thrown from the track, criminally, and without the knowledge of the defendant, broke and disarranged said switch, whereby the rail was thrown out of line so that the engine in passing at that place was derailed and the intestate mortally injured; (2) that if any agent or servant of the defendant was guilty of negligence which caused the injury of the plaintiff's intestate, he was a fellow-servant of the intestate Miller; and (3) that the injury was caused by the criminal act of one W. A. Hill, a stranger to defendant, combined with the negligence of said Miller and his fellow-servants. Issue being joined on this, a trial was had which resulted in a verdict and judgment for the plaintiff, and from which this appeal is brought.

At the close of the evidence for the plaintiff, the defendant interposed a motion for a judgment of nonsuit, which, the trial court refusing, is assigned as error.

The evidence tended to show that the overland train, on which the plaintiff's intestate was acting as engineer of the locomotive drawing such train, was derailed at a switch about one and a half miles south of Albany, a little after 9 o'clock on the evening of Sunday, July 28, 1889; that the locomotive was overturned, and Miller was caught in or under it, whereby he was so badly bruised and scalded by the escaping steam that he died the next day; that the train reached Albany about 8:40 o'clock P. M., and stopped there twenty minutes for supper; that shortly after its arrival the Lebanon locomotive, in charge of Conductor Huston, left Albany on the main track to the Lebanon switch.   On reaching the switch, Huston's locomotive was halted until a brakeman aboard of it could throw the switch, and let his locomotive pass from the main track to the Lebanon branch track; that it was after dark, necessitating the use of a lantern, and that when he attempted to move the switch, so as to throw the rails in position for the passage of the locomotive, something interfered with the shoving over of the switch-rails, whereupon, taking his lantern to discover the cause of it, he found clamped between the rails a stone, and that to remove it he had to return to the switch-lever and throw it back into the same position it had occupied before he touched it, but that in doing so he observed the rails came properly back into place for the main line; that he went and threw the stone from the track, and then returned the switch-lever without further difficulty into position for the passage of the locomotive from the main track to the Lebanon branch track; that the locomotive passed through and he then threw the switch back into proper position for the passage of trains on the main track, but that he did not observe at the time whether or not the rails obeyed the switch and came back into line with the rails of the main track, but supposed that they did.   Huston,

however, who was on the locomotive at the time, and about twenty feet distant from the switch, testified that he did notice and observe that the rails at that time came into line with the rails of the main track; that he was able to observe the movements of the rails by the brakeman's lantern, which shone on the bright surface of the rails; that the switch was then locked by the brakeman, who remounted the locomotive, and it moved on towards Lebanon.   In a few minutes after this Miller came on the main track with his engine and train from Albany, and when within about fifty feet of the switch, observed that the switch-rail was not in line with the main track rail adjoining to and next beyond it on the south, but it was then too late to stop the train, and the locomotive was derailed, whereby Miller was so badly injured that he died the next day.

The cause of the accident was due to the fact that a draw-bar of the switch was out of place, the linch-pin being out, so that the rails had not come back to place when the brakeman had adjusted the switch after the engine going to Lebanon passed it.   The construction of the switch was such that two iron rods attached to it passed from it through the switch-rail.   One of the rods pushed the T-rail over into line with the rails on the branch line, when desired, and the other rod pulled the rail back, when it was necessary, into line with the rails on the main track.   Each rod had an iron eye or ring on the end next to the switch, which fitted into a shank, and was held in it by an iron pin or split-key, passing through a hole in the outer end of the shank.   An iron washer worked between the eye of the rod and the split-key, so that the eye of the rod could not be slipped off of the shank without first drawing the split-key out of its hole and removing the washer from off the shank.   When the switch was examined, soon after the accident, it was found that the switch indicated, or at least appeared to have been tampered with prior to the accident, either before or after the Lebanon locomotive passed through the switch. The rod which should have pulled the switch-rail back into

line with the rails on the main track had been taken off of
its shank and dropped to the ground. The split-pin which
had held that rod in place on its shank was not found, but
the washer which worked between the split-pin and the
rod's eye had been put back on the shank after the rod was
removed off it. There is no other testimony than this tend-
ing to show how long the switch had been so disarranged
before the accident occurred, or that the defendant company
knew, or by the exercise of reasonable diligence ought to
have discovered, that the switch had been tampered with,
or was not in proper working order, before the time when
the accident occurred.

Numerous exceptions were taken to instructions asked
and refused and to instructions given by the trial court, and
to the refusal to admit certain testimony relative to the con-
fession and conviction of one W. A. Hill for tampering with
and disarranging the switch which caused the accident, but
all the questions involved may be reduced to two, namely:
(1) Whether Conductor Huston or the brakeman who
operated the switch occupied the position of vice-principal to
the plaintiff's intestate, Miller, so that his negligence in fail-
ing to discover that the switch was disarranged was the
negligence of the company, and rendered it liable for the
injury he sustained; and (2) whether the trial court erred
in refusing to allow the judgment roll of the circuit court of
the state of Oregon for Linn county, showing the indictment
and conviction of W. A. Hill for the killing of the said John
W. Miller by disarranging a switch on the road of the defend-
ant, and thereby causing the locomotive to be derailed in
Linn county on July 28, 1889, to be received in evidence, or
to allow Dr. Davis, a witness for the defendant, to answer
certain questions as to whether he (W. A. Hill) ever confessed
or admitted to him that he interfered with or broke the
switch on the occasion under consideration. These will be
considered in the order stated.

There was a general rule of the company providing that
conductors would be held personally responsible for the

proper adjustment of switches used by their trains, and it was claimed that the effect of this rule was to create Huston vice-principal of Miller as between the latter and the company. The argument for the plaintiff proceeds upon the assumption that the switch was broken and disarranged when the Lebanon locomotive used it, and that Huston had devolved upon him the duty of seeing that the switch was properly adjusted, which being a personal duty the company owed to Miller, that the negligence of Huston in failing to discover that the switch was out of order was the negligence of the company, and rendered it liable for the injurious consequences which ensued. The rule was a proper and needful regulation, and obedience to it was well calculated to insure safety, but it was not designed to create any new or distinct liability other than the law established. As a rule, it did not operate to change the rule of law which governed the relation of the parties and fixed their liabilities. The conductors were not expected to perform the duties of switchmen—some one under them, usually a brakeman, discharged this duty, by their direction; and the object of the rule in making them responsible was to secure the best possible performance of the duty of a switchman to insure safety in operating the trains. It added no new or other element to the legal relation of the parties concerned than already existed. The whole duty combined and to be performed in this regard, by conductor and switchman, in operating the switch, only constituted the proper discharge of the duty of a switchman. It is not the duty of the master, "as with a personal sight and touch," to operate the switches on the road. "It is utterly impracticable so to do, and a brakeman or fireman on a train knows that it is as well as any person connected with the business." And FOLGER, J., said: "The duty of the master is performed when he provides beforehand, and makes known to his servants, rules explicit and efficient, which, if observed and followed by all concerned, will bring personal notice to every one entitled to it" (*Slater* v. *Jewett,* 85 N. Y.

61, 39 Am. Rep. 627); and in the present case, "if followed and observed," will bring safety and security, as was intended by the rule.    But the act performed was that of a switchman, his duty being to operate the switch and adjust the rails, and the object of the rule was to secure its proper performance, or to avoid its negligent discharge to insure safety.    It was its negligent discharge which caused the injury.    It is, then, the character of the act to which we must look to determine the legal relations of the parties concerned.    That act involved the duty of a switchman, which was to operate and properly adjust the switch, a duty which could not properly be performed without discovering any failure of the switch to properly adjust the rails.    In the case at bar the duty was to operate the switch and pass the locomotive on the branch track, and then adjust it so that the south-bound train coming on the main track would have a continuous line at that point.    A like duty would have devolved upon any switchman who might have been detailed and stationed at that switch, and which counsel claim ought to have been done to guard against the switch being tampered with and disarranged.    The duty of a switchman is to operate the switch, and see that it properly adjusts the rails, so that the trains may pass with safety; and it is the negligent discharge of this duty with which we are to deal.

We begin by saying that the principle that any duty which the master is required to perform for the safety and protection of his servants cannot be delegated to any servant of any grade so as to exempt the master from liability to a servant who has been injured by its non-performance, cannot be questioned.    Nor can it be questioned that among these duties are not included the duty of a railroad company to keep its road-bed and track, rolling-stock, tools, machinery and appliances in good and safe condition; to cause as frequent and thorough inspection of these as can be done consistently with the conduct of its business for the purpose of discovering any defects that may occur from accidental causes, or the effects of wear and tear, or the progress of

decay; to exercise care in the selection of its servants, and in their retention in its service; and to adopt such rules and regulations as are calculated to guard against accidents, and to make the servants in its employ reasonably safe.    Our inquiry then is:    Was the character of the act performed by the servant such an act as the law implies a contract duty upon the part of the master to perform?—for if it was, then such servant, in respect to that act, ceases to be a servant, and becomes an agent or vice-principal.

Now, the case presented is not negligence of a switch-man in leaving a switch, safe and suitable as an appliance, open and misplaced, whereby a like accident would have happened, but negligence in failing to discover that a switch had been put out of order by some extraneous circumstances, so that it did not operate to adjust the line as it ought, and was supposed to have done.    In one case, the negligence consists in leaving a switch, sound and suitable for its purposes, open and misplaced; and in the other, in leaving the switch open and misplaced, because the switch, having been put out of order, did not operate, and that fact was not observed.    But in either case the switchman would seem equally derelict or negligent, for the duties of his employment require him to see that the switch moves the rails, and puts them where it is designed that they should go for the operation of the trains; and this duty, when properly performed, necessarily includes the observance of any failure of the switch to operate or perform its office in adjusting the rail.

Taking the view of the facts as claimed by the plaintiff, his position is that the switch was tampered with or put out of order before the Lebanon locomotive passed over it.    Nor is it claimed that the switch was not originally a safe instrumentality, and suitable for its purpose, or that a sufficient length of time elapsed since the switch was disordered to charge the defendant with notice of its condition; but the claim is that the employe, upon whom was devolved the duties of a switchman, stood for the master in the perform-

ance of that duty, and that when the Lebanon engine passed, the switch being out of order, if such employe had exercised ordinary care in the performance of this duty, he would have seen that the switch did not operate and adjust the rails, and examined the cause of it and discovered its disordered condition, and prevented the accident. Counsel admit that such employe or servant may be a fellow-servant of Miller in the performance of some of his duties, but they say that "in the duty of maintaining a switch in order as a safe instrumentality for the performance by Miller of his duty within the line of his hazardous employment, he was not a fellow-servant"; citing *Ford* v. *Railroad Co.* 110 Mass. 260, 14 Am. Rep. 598, in which the court says: "The agents who are charged with the duty of supplying safe machinery are not in the true sense of the rule relied upon, to be regarded as fellow-servants of those who are engaged in operating it." But can it be said that a switchman or employe upon whom is devolved the duty of a switchman is charged with the duty of maintaining a switch in order as a safe instrumentality —that is, if the switch is out of order, to repair it or to supply a new one when necessary? It is no doubt true that such a duty devolves upon the defendant as master, or any servant to whom it delegates the duty, to exercise care not only in the construction but the maintenance in repair of its switches as well as its tracks, road-beds, bridges, and trestles, etc. The reason is that these are personal duties, which the company is legally bound to perform, and owes to its employes operating its trains over the road; but when the company delegates such duties to its servants it is liable for the negligent performance of such duties. Hence, as Mr. McKinney says: "A section boss in charge of a squad of hands working, altering, and repairing the road, or one of his subordinates, can in no sense be regarded as a fellow-servant of employes operating trains over the road, so as to exempt the company from liability for their negligence in leaving the track defective. The company delegates to these employes the performance of a duty which the law makes it

incumbent on the company to perform, *i. e.*, that of furnishing a reasonably safe track and road-bed, and keeping it in repair, and it is liable for the negligent performance of this duty." (McKinney on Fel. Serv. § 136, and note of authorities.)

If we take the character of the act performed by such servant to determine whether he is an agent or representative of the company or a fellow-servant, what is there in the act of operating a switch so as to properly adjust the rails for the passage of trains which may be considered in any sense to impose or delegate the duty to such employe to furnish construct, keep, or maintain in repair such switch?   However liberally we may construe the rule as to co-servants, it is difficult to perceive, if the rule itself is to remain, that a servant engaged in the operation of a switch is a representative of the master, or other than a fellow-servant engaged in a common employment for the successful management of the trains.   The act he performs involves no duty of construction or repair, or other duty in regard to the switches of the road if out of repair or unfit for use, whether by wear and tear or by the criminal interference of strangers, than to promptly notify the company of its condition, so that it may be repaired or its place supplied.   It is the law, in the absence of express contract, that establishes the relation of the parties creating him agent or representative of the master who performs duties which the law itself makes it incumbent on the master to perform, and not the rules or regulations of the company, which are designed for the guidance of its servants, and to secure reasonable safety in the conduct of its business.   The failure to make proper rules and regulations adapted to the proper management of a hazardous business might render a railroad company liable, but the object of the rules is not to alter or affect the legal relation of the servant.   In this regard the defendant was not negligent.   It had promulgated a rule designed to secure safety in the passing of trains, and to remind its servants of their responsibility, and to enforce the obser-

vance of care in the proper adjustment of its switches when used.

"It may be conceded," said JOHNSON, J., "that it is the duty of a railroad corporation to prescribe, either by means of time-tables or by other suitable modes, regulations for running their trains with a view to their safety; but it is obvious that obedience to these regulations must be intrusted to the employes having charge of the trains. Such obedience is matter of executive detail, which, in the nature of things, no corporation or general agent of a corporation can personally oversee, and as to which employes must be relied on." (*Rose* v. *Railroad Co.* 58 N. Y. 221.) It is not the rule, but the legal relation which the parties sustained to each other, whether co-servants or not, which determines the liability of the company. The case stands in this wise: As the switch was originally safe and suitable as an instrumentality, and the evidence indicates that it was tampered with and put out of order before the Lebanon train passed, and there is none tending to show that by the exercise of reasonable care and diligence the company knew or ought to have known that it was so disarranged and not in proper working order, so as to affect it with notice of its condition, then, unless the employe upon whom was devolved the duty of a switchman represented the company, and is chargeable with notice of its disordered condition, the plaintiff has no standing ground. The necessities of the case require that such employe shall be considered as a representative of the company in the negligent performance of this duty to affect it with liability. It is therefore claimed that it was the duty of such employe to maintain the switch in good order as a safe appliance for the passage of trains, which, being the duty of the company, the company must be considered as constructively present in the person of the switchman when he operated it and left it misplaced, and is chargeable by reason thereof with notice of its condition, and his negligence in not discovering it was the negligence of the company.

But we have already shown that no duty of constructing,

repairing or maintaining in good order such appliances is delegated to such employe, or that he is invested with any power or authority in the premises other than performing the duty of a switchman; and there being no evidence to charge the company with notice of its disarranged condition, except through such employe, the company is entitled to be considered as having performed its duty, unless he was its agent or representative, so as to affect the company with notice, and render it liable for his negligent discharge of the duty of a switchman. That a switchman is a fellow-servant to the employes on the train has been so frequently held as seems to admit of little doubt. McKinney on Fell. Serv. § 138, says: "The co-operation of the switchman is necessary to the successful management of the trains, and employes upon the train in the common service assume the risk of the negligent discharge of his duty." In *Roberts* v. *Railroad Co.* 33 Minn. 218, the train ran off the track in consequence of a misplaced switch, negligently left open by a switchman, thereby causing the death of a baggage-master on the train. The court held that the switchman and baggage-master were fellow-servants within the rule, exempting the company from liability. In *Brown* v. *Railroad Co.* 68 Cal. 176, the court says: "The engineer and switch-tender, although on duty in separate departments, were, in the discharge of their duties, under the same general employment; and for the negligence of the fellow-servant of the intestate the defendant is not liable."

In *Harvey* v. *Railroad Co.* 88 N. Y. 484, an engine attached to a train on defendant's road was thrown from the track by a misplaced switch, which the switchman had neglected to close, he being engaged at the time in conversation with another. The plaintiff's intestate, who was a fireman on the engine, was killed. The court says: "This is a plain case. It is evident that the cause of the injury was the neglect of the switchman to properly adjust the switch after using it to pass the local freight. As the switchman must be deemed to have been the co-servant of the plaintiff's

intestate, the plaintiff cannot recover, unless some neglect of the defendant, as principal, also contributed to produce the injury." In *Naylor* v. *Railroad Co.* 33 Fed. Rep. 801, in an action against a railway company for the death of the plaintiff's intestate, who was an engineer, it appeared that the death was caused by the negligence of a switchman, who left a switch open; *held*, that the engineer and the switchman were fellow-servants. In *Randall* v. *Railroad Co.* 109 U. S. 483, it was held that a brakeman working a switch for his train on one track in a railroad yard is a fellow-servant with the engineer of another train of the same corporation. Mr. Justice GRAY, who delivered the opinion of the court, said: "The general rule is now firmly established that one who enters the service of another takes upon himself the ordinary risks of the negligent acts of his fellow-servants in the course of the employment. * * * Persons standing in such relation to one another, as did this plaintiff and the engine-man of the other train, are fellow-servants according to the very great preponderance of judicial authority in this country, as well as the uniform course of decision in the house of lords and in the English and Irish courts, as is clearly shown by the cases cited in the margin"; citing numerous authorities. In *Slattery's Adm'r* v. *Railroad Co.* 23 Ind. 81, it was held that a brakeman on a train and one whose duty it is to attend a switch are engaged in the same general undertaking, and the company is not liable to one for an injury caused by the negligence of the other. In *Railroad Co.* v. *Henry*, 7 Ill. App. 322, it is held that an engineer running a switch-engine and and a switch-tender are engaged in common employment, and are fellow-servants.

In *Walker* v. *Railroad Co.* 128 Mass. 10, an engineer and fireman were killed by a misplaced switch, which had been negligently left open; and upon an action to recover damages, the court below directed a verdict for the defendant, which was sustained, the court saying: "The cause of action in each of these cases was the misplacement of a

switch through the negligence of a fellow-servant of the plaint-
iff's intestate"; citing *Farwell* v. *Railroad Corp.* 4 Met. (Mass.)
49, 38 Am. Dec. 339; *Gilman* v. *Railroad Co.* 10 Allen, 233,
87 Am. Dec. 635; *Railroad Co.* v. *Troesch,* 68 Ill. 545, 18 Am.
Rep. 578; *Tinney* v. *Railroad Co.* 62 Barb. 218; 7 Am. & Eng.
Ency. 886, "Fellow-Servants"; McKinney on Fell. Serv. § 138.
Nor is there anything decided in the cases to which our attention
has been specially called in conflict with the principle we are
deciding.

In the case of *Davis* v. *Railroad Co.* 55 Vt. 84, 45 Am Rep.
590, it appeared that through the negligence of the company's
bridge-builder in constructing and the road-master in repairing
a culvert, it washed out, whereby a foreman was killed, and the
court held that the company was liable, saying: "The bridge-
builder and road-master, while inspecting and caring for the de-
fectively constructed culvert, were performing a duty which, as
between the intestate and the defendant, it was the duty of the
defendant to perform. Their negligence therein was the negli-
gence of the defendant." This is but applying the rule that
where the master has intrusted a duty to a servant which the
law devolved upon him to perform, such servant is his repre-
sentative, and any negligence on his part is the negligence of the
master. *Calvo* v. *Railroad Co.* 23 S. C. 526, 55 Am. Rep. 28,
was decided on the same principle. There, a locomotive engineer,
while running his engine, was injured through the negligence of
a section-master and supervisor of the track-laying force, who,
in disregard of the appropriate signals, took up a portion of the
track, and thereby derailed the engine. The court held that
the true test was whether this section-master was employed to
discharge the duties of the master, and also that it was the duty
of the master to provide a suitable and safe place for his em-
ployes to work in and on, which duty had in this case been
committed to the section-master. His negligence was therefore
properly adjudged the negligence of the master.

The same principle was recognized in the case of *Moon* v. *Rail-
road Co.* 78 Va. 745, 49 Am. Rep. 401. In that case the decedent
was a brakeman on a material train. A section gang at work on

the track failed to signal the train, although it had the rails misplaced. In consequence, the train was derailed and the decedent so badly injured that he died in a few hours. The court held that the section-men and the decedent were not fellow-servants, saying that "when a company delegates to an agent or employe the performance of duties which the law makes it incumbent on the company to perform, his acts are the acts of the company, his negligence is the negligence of the company." Here the section-master was in charge of a squad of men working, altering, and repairing the road— duties personal to the master, and which he was legally bound to perform, and consequently for which the master was responsible if negligently performed by the servant to whom he intrusted them. The cases cited by the court (*Brothers* v. *Carter*, 52 Mo. 372, 14 Am. Rep. 424; *Flike* v. *Railroad Co.* 53 N. Y. 549, 13 Am. Rep. 545; *Corcoran* v. *Holbrook*, 59 N. Y. 517, 17 Am. Rep. 369; *Mullan* v. *Steamship Co.* 78 Pa. St. 25, 21 Am. Rep. 2; *Ryan* v. *Railroad Co.* 60 Ill. 171, 14 Am. Rep. 32) recognize the same principle, and it is not questioned. Among other cases affirming this doctrine are *O'Donell* v. *Railroad Co.* 59 Pa. St. 239, 98 Am. Dec. 336; *Railroad Co.* v. *Carroll*, 6 Heisk. 347; *Railroad Co.* v. *Holt*, 29 Kan. 149; *Slater* v. *Jewett*, 85 N. Y. 61.

In all these cases the master intrusted a duty to the servant which the law made it incumbent on him to perform, and within the meaning of the rule of liability for negligence, he was a representative of such master in the performance of that duty, and not a fellow-servant.

The duties of a switchman to operate the switch and to adjust it properly for the passage of trains involve no delegation of authority to furnish, or keep, or maintain in repair the track or its switches, or any of its appliances. No duty of this kind was confided to such employe, or included in the character of the act he performed, and without which he cannot be made a representative of the company, so as to affect it with liability for negligence. It is unquestionably the duty of the master to every employe to provide suitable appliances, machinery and instrumentalities, and a reason-

ably safe place to perform his labor, and his failure to do so, whether by personal negligence or the negligence of a servant to whom he has delegated such duty, will render him liable; but the master cannot be held liable for the negligent performance of a duty by a servant which involves the performance of no such personal obligation. If the company is to be held liable for negligence, some other ground must be sought upon which to predicate it; for the books seem decisive to the point that such a servant, engaged in the performance of the duties of a switchman, is not a representative of the master, but a fellow-servant of the employes upon the train,—of the plaintiff's intestate,—who assume the risk of his negligent discharge of his duties. While some of the authorities extend the rule further than others, and embrace a more numerous and various class as fellow-servants engaged in a common employment,—and further than we are inclined to extend it,—yet none of them has so limited and restricted its operation as to destroy the relation of fellow-servants between a switchman and the servants on the train, and consequently the master cannot be held liable for the negligent discharge of his duties.

The next objection relates to the refusal of the court to admit as evidence the indictment and judgment of the conviction of W. A. Hill for the killing of the plaintiff's intestate by disarranging a switch on the defendant's railroad, and certain confessions it was proposed to prove that he had made to Dr. Davis. The court considered the evidence as *res inter alios acta,* and declined to admit it. It was shown by the evidence that Hill and his companions applied to Conductor Huston about one-half hour before he left Albany with his locomotive on that evening for the privilege of riding upon his locomotive to the farm at which they were working on the line of the Lebanon branch of the company's road, and that Huston refused to allow them to ride, as it was contrary to the rules of the company, and that they left and walked away in the direction of the switch. The evidence is offered on the ground, as stated by counsel,

that "it is a matter of public notoriety that the switch mentioned in the pleadings was, on the evening of the day on which this accident occurred, tampered with and disarranged by one W. A. Hill and his accomplices, and that as a result the train was derailed, and the intestate and his fireman, Guthrie, were mortally injured; that Hill was convicted of the crime upon his own confessions, and sentenced to the penitentiary therefor; that his accomplices escaped because there was no witness to their acts except themselves, and their confessions were ruled to have been made under such circumstances as to exclude them from being given in evidence against them; that, as there was no witness of their subsequent conduct to connect them with the breaking of the switch, there was no proof of it other than by the record of Hill's conviction," etc., of which a certified transcript was offered in evidence, and ruled out, and the defendant was left without any evidence in support of its plea. Counsel say that they "have searched the books in vain for a case in point," but that they have been unable to find any bearing on the subject. Their argument in support of its admission is that the record of the conviction of a party of a crime by the public prosecutor is public property, and may be given in evidence whenever it becomes a fact material to be shown in connection with the issues joined in any other suit or action; that it is not conclusive evidence against whom it is offered, nor does it estop him to controvert or deny it, but that it is *prima facie* evidence of the facts thereby established. They cite *Maybee* v. *Avery*, 18 Johns. 352, and *Mead* v. *Boston*, 3 Cush. 404. The effect of the ruling in *Maybee* v. *Avery*, *supra*, can be best understood from Judge SUTHERLAND's statement of it in *People* v. *Buckland*, 13 Wend. 596, and from which we cite. He says that Judge SPENCER, "after stating the general rule that in order to render a verdict and judgment competent evidence it must be on the same point, and between the same parties or privies, and give the reason on which the rule is founded. He adverts to the exception to the rule which has already

been noticed, to wit, that where the matter in dispute is a question of public right all persons standing in the same situation as the parties are affected by it; and he remarked that in his opinion a verdict on an indictment formed another exception, and upon the same principle; that the public was the party aggrieved, the prosecution was carried on by their officer, and that any person might when necessary avail himself of a conviction. He observed that the plaintiff in the case could not complain, for he had an opportunity to cross-examine the witnesses, and to produce his testimony, and to reverse the judgment if erroneous; but that the verdict was not conclusive, and that the plaintiff should have been allowed to repel it."

The evidence which was objected to in that case was a record of conviction for stealing two hens, but was admitted by Judge SPENCER, who tried the case. The plaintiff then offered to show that the evidence on which he was convicted was false, and that he in fact owned the two hens. This was objected to on the ground that the record of conviction was conclusive until reversed, which was sustained, and the evidence rejected. Upon a motion for a new trial, it was held that the record of conviction was admissible in evidence, but that it was only *prima facie,* and that the plaintiff should have been allowed to disprove the fact, and to give evidence of the falsity of the testimony on which the conviction was founded. This case, as SUTHERLAND, J., observed, "only decides that a verdict and judgment on an indictment are competent *prima facie* evidence against the defendant in the indictment," but he adds that "the principle laid down makes them competent evidence upon the point involved, even between strangers to the original proceedings, and this I am inclined to think is the true rule." In *Mead* v. *Boston,* 3 Cush. 406, SHAW, C. J., said: "The admission in a civil action of a conviction on an indictment founded on a plea of guilty is not an exception to this rule. That is received not as a judicial act, having the force and effect of a judg-

ment, but as a solemn confession of the very matter charged in the civil action." (1 Greenl. Ev. § 537.)

But the record of conviction offered in this case was not founded on a plea of guilty, for Hill pleaded not guilty, and his confessions were proven, upon which he was convicted. In *Brownsword* v. *Edwards,* 2 Ves. Sr. 245, it was held that a sentence in a criminal proceeding cannot be used as evidence in a civil action. The lord chancellor said: "On the trial the sentence was offered in evidence to prove that they were not married. The whole court were of the opinion that it could not be given in evidence, because, first, it was a criminal matter, and could not be given in evidence in a civil cause; next, that it was *res inter alios acta,* and could not affect the issue." In *Gibson* v. *McCarty,* Hardw. Cas. Temp. 311, a judgment of conviction for forgery was offered in evidence, but it was held that such record of a conviction in a criminal matter cannot be read as evidence in a civil suit. In *Rex* v. *Warden of the Fleet,* 12 Mod. 339, it was held that a conviction of battery would not be evidence in an action for the same battery, nor *vice versa;* and that records of conviction or verdicts could not be given in evidence whenever the benefit would not be mutual. (*Patterson* v. *Gaines,* 6 How. 586; 1 Greenl. Ev. § 537; *Com.* v. *Lincoln,* 110 Mass. 410.) The real ground is a want of mutuality arising from the parties not being identical; nor are the rules of decision and the course of the proceedings the same. While it is true there does seem to be some privity between the facts offered to be established by the records of conviction and the fact in issue which would make it relevant evidence, and receivable as such, yet it has been thought better for the administration of justice to preserve the general rule which excludes verdicts and judgments between other parties than to form an exception to it because of some particular circumstances. In excluding this record we are not prepared to say that the court erred; but for the reasons already stated, the judgment must be reversed, and a new trial ordered.

[ON REHEARING.—Cause remanded with direction to the court below to allow motion for non-suit.]