Argued July 6, affirmed July 24, 1917.

## EMERSON v. PORTLAND, E. & E. R. CO.*

### (166 Pac. 946.)

**Master and Servant—Restoration of Unsafe Place—Assumption of Risk.**

1. Where a railroad which purchased a small feeder line in inferior condition and was repairing it knew that a trestle beside which it was building a fill was in excessively unsafe condition, but its employee in the construction work riding on a hand-car did not know it, the employee was not required to examine the trestle to ascertain its condition, having a right to assume that the road would not send him across a dangerous trestle.

> [As to how far servant may rely on master's knowledge concerning risk, see note in 24 Am. St. Rep. 320.]

**Master and Servant—Assumption of Risk—Obvious Danger—Question for Jury.**

2. Whether the dangerous condition of the trestle was so open and obvious that the employee must have observed it, *held* for the jury as a question of fact.

**Master and Servant—Safe Place to Work.**

3. It is the duty of the master to furnish the employee a reasonably safe place to work, a duty performed when he has exercised reasonable diligence to do so.

**Master and Servant—Safe Place to Work—"Reasonably Safe"—"Reasonable Safety."**

4. The term "reasonably safe," used in relation to a master's duty to furnish safe tools and a safe place to work, implies such measure of safety as accords with common usage and practice in matters of a particular character; "reasonable safety" implies such a condition as ordinary care and diligence will secure.

**Appeal and Error—Harmless Error—Instruction.**

5. In a railroad employee's action for injuries on a trestle, in the absence of request by the road for an instruction that it was under duty to use ordinary care to make the trestle reasonably safe, where there had been utter lack of diligence of the road's servants in respect to taking precautions for the safety of persons passing over its road, the omission to give such an instruction was harmless to the road.

**Trial—Instructions—Repetition.**

6. The refusal of instructions covered by the general charge was not erroneous.

*On knowledge as an element of an employer's liability to an injured servant, see comprehensive note in 41 L. R. A. 33.

On the general rule with respect to places and appliances furnished to servant, see note in 6 L. R. A. (N. S.) 602.          REPORTER.

From Multnomah: WILLIAM N. GATENS, Judge.

Action by S. E. Emerson against the Portland, Eugene & Eastern Railroad Company, a corporation, to recover damages for a personal injury. From a judgment in favor of plaintiff, defendant appealed. Affirmed.

Department 2. Statement by MR. CHIEF JUSTICE McBRIDE.

This is an action to recover damages for a personal injury received by plaintiff and occasioned by a hand-car upon which plaintiff was injured. The action was brought under the Federal Employers' Liability Act. The complaint alleged that on August 24, 1913, plaintiff was engaged as a laborer performing section work for the company, and that upon that date while so employed he was riding upon a hand-car of defendant across a trestle of defendant's road, and that while so riding the car left the track and plaintiff was thrown from said car and received the injuries of which he complains. Defendant is charged with negligence in the following particulars:

"(a) That the trestle hereinabove referred to, which was maintained by defendant, and over which plaintiff was riding upon said hand-car was carelessly and negligently maintained, in that the same was old, worn, dilapidated and in such an old, worn, and dilapidated condition that the rails upon said track were not permanently or securely fastened to the ties; that said ties were loose and irregularly spaced, and there was not a sufficient number thereof; (b) that said rails were old, worn, warped, and bent, and out of alignment, and insufficiently and improperly fastened together."

Defendant answered denying plaintiff's injury, and alleged the dilapidated condition of its trestle and by way of a separate defense set up the following facts:

"That the trestle referred to in plaintiff's complaint was a part of the line of the Corvallis & Alsea River Railroad which prior to the time of the accident described in plaintiff's complaint had been purchased by this defendant; that this defendant was at the time engaged in the construction of a new trestle to replace the said old trestle, and also engaged in the reconstruction of the said line of railroad of the said Corvallis & Alsea River Railroad; that plaintiff's duties were to assist in said reconstruction of said line and in working upon said tracks in order that the same might be safe and secure for the travel of trains. * * That during all of the times mentioned in plaintiff's complaint said line of railroad was used by this defendant for the purpose of transporting thereover loaded and empty freight and passenger cars, and that upon said freight-cars, were carried freight originating at points in the state of Oregon and destined to points outside of the state of Oregon; also freight originating at points outside the state of Oregon and shipped to points in said state of Oregon, on the defendant's line of railroad; that said section of railroad upon which plaintiff was employed as a section laborer was an integral part of defendant's system of railways and was used by defendant in carrying on its business of interstate and intrastate commerce. * * That for a long time prior to August 24, 1913, plaintiff had been a section laborer and had worked in and around railroad tracks and had particularly worked in and around the tracks of this defendant near the city of Corvallis, including the trestle referred to in plaintiff's complaint; that at all the times mentioned in plaintiff's complaint and for a long time prior thereto plaintiff fully knew, understood, and appreciated the condition of said track and trestle, and fully knew, understood, and appreciated the risks and dangers of riding over the same on hand-cars and that said risks and dangers were open and obvious, and plaintiff understanding and appreciating such perils, the same being open and obvious, continued working for this defendant and riding over said trestle, thereby assumed any and all

risks of accident to himself arising therefrom, and that the said accident to plaintiff and whatever injuries resulted to plaintiff therefrom, was caused by one of said risks so assumed by the said plaintiff."

The new matter having been put in issue by appropriate denials there was a jury trial and verdict and judgment for the plaintiff, from which defendant appeals.

At the conclusion of plaintiff's testimony there was a motion for a nonsuit, which was overruled. Among others the court gave the following instruction, which was excepted to by defendant, and is assigned here as error.

"I instruct you that every employer has the right to choose the appliance to be used in his business, and to conduct his business in a manner most agreeable to himself. It is not required nor obliged to change its bridges from old to new in order to secure the greater safety of its employees, provided the old bridge is a reasonably safe one, and an employee who enters its service with the knowledge of circumstances attending his employment cannot complain of his master's customs or habits, nor recover for injuries in and resulting from that particular service. In other words, in this case the defendant company had a right to use the old bridge; it was not required to build a new bridge, provided the old bridge was a reasonably safe bridge. That is the point. As I said in the other instruction a man can conduct his business in any way he sees fit, and he is not held accountable because he does not use a new machine, but the law says he must use one that is reasonably safe. That is the degree of care he is required to furnish. The question you are to determine is whether or not this particular bridge was reasonably safe. If you find it was not in a reasonably safe condition, the question you ask yourself is, did the defendant know it to be unsafe, or did it have reason to believe it to be unsafe. If it knew the bridge was not reasonably safe for employees to go over it on

a hand-car in order to get to their work, or had reason to believe it was not safe, then the law says you are chargeable with negligence and it is accountable to him personally by reason thereof; unless the party who went over the bridge has reason to believe or knew or had reason to believe the bridge was unsafe.''     ₒ

Exception was also taken to certain remarks of counsel for plaintiff made during the progress of the trial, which will be noticed in the opinion.     AFFIRMED.

For appellant there was a brief over the names of *Mr. Ben C. Dey, Mr. William D. Fenton, Mr. Ralph E. Moody* and *Mr. John F. Reilly,* with an oral argument by *Mr. Dey.*

For respondent there was a brief over the names of *Messrs. Davis & Farrell* and *Mr. E. E. Wilson,* with an oral argument by *Mr. W. E. Farrell.*

Opinion by MR. CHIEF JUSTICE MCBRIDE.

There is little dispute concerning the facts in this case, which are these: The defendant was engaged in constructing a line of railroad from Corvallis to Eugene through the town of Monroe, which is an intermediate point between Corvallis and Eugene. The Corvallis and Alsea Railroad Company had a line of road running from Corvallis to Monroe, a distance of about eighteen miles, which defendant purchased to be used in making a part of the connection. This purchase was made in 1912. The road was not in good condition when purchased not being properly ballasted, the ties being of inferior quality, the steel light, the trestles in poor condition, and the whole road being far below the standard of the Southern Pacific railroad system, which is an interstate road and of which the Portland, Eugene & Eastern is a part. While the

road from Corvallis to Monroe was not up to the standard of the Southern Pacific system and was run down and deficient in the particulars above stated, there was no evidence that it was actually unsafe or dangerous at any point except the trestle where this plaintiff was injured, and after the purchase the defendant constantly used it for the passage of its trains carrying freight and passengers as well as trains carrying gravel used in ballasting the road between Corvallis and Monroe and also to points on the Southern Pacific system north of Corvallis. Immediately after the purchase the defendant began a practical reconstruction of the line. It did not attempt to rebuild the trestle upon which plaintiff was injured, but began a fill of considerable length immediately west of it, the trestle itself being the northerly approach to a bridge across Mary's River, which flows through the southerly portion of Corvallis. The fill ran practically parallel to the trestle and approached the northerly end of the bridge proper and was designed when completed to take the place of the trestle. Its distance from the trestle is not stated, although it appears from the testimony that it was some 50 feet from that part of the trestle where the accident occurred, and it appears that the fill and the trestle converge at the northerly end of the bridge and that the fill in addition to being more permanent in its character obviated a curve which existed on the trestle near the north end of the bridge proper. The plaintiff was a common laborer on the section, a farmer by vocation, and had only the knowledge of railroads that farmers usually possess. He resided in Corvallis and had been employed upon the road engaged in ballasting and such work about five months previous to the accident. He had never worked upon the trestle or

walked over it before the accident, but was employed for the most part farther south and as far sometimes as twelve miles from Corvallis. He, with other employees, was taken to his work upon a hand-car of the company. The car was new and in good condition. He testifies that he never observed the condition of the trestle, and knew nothing of any defects in it. The evidence indicates that the trestle was in even a worse condition than that mentioned in plaintiff's complaint. This description of it is given by a witness for plaintiff:

"The rails were crooked; the ties were not spaced; there were places all the way from, oh, six to eight inches up to two feet wide where the ties were on the track and were not spiked down good; the spikes about half drove; the rails were very kinky, low joint and centers."

The defendant's superintendent of construction testified in regard to the condition of the trestle as follows:

"What condition were the ties of the trestle in?

"A. The ties were split by being skewed around—the action of loads going over the trestle, and they were further split by making an endeavor to spike them to the stringers to hold them in proper place.

"Q. What were these conditions on the surface, were they to be seen?

"A. They were.

"Q. What, if anything, was there to prevent a man who was traveling over the trestle, on a hand-car, or any other vehicle, or any other kind of a car, from observing these conditions of the trestle?

"A. A man could readily see by a casual examination the condition of the deck of the trestle.

"Q. How were the rails?

"A. The rails were old and surface bent, and some ball worn.

"Q. What was there to prevent an ordinary person from seeing those things?

"A. Nothing.

"Q. You said a moment ago a person could observe the condition by a casual examination, what did you mean by that? Do you mean by going there for the purpose of examining it?

"A. I mean it was not necessary to examine the trestle with a microscope to see it was not in proper condition.

"Q. What would you say about its being so obvious that any person going over it would see it?

"A. It could readily be seen that the structure was not in good condition.

"Q. And the cracks and unevenness in the ties, could any person who looked fail to see them?

"A. They were in evidence.

"Q. The condition of the rails, could anybody who looked fail to see that?

"A. He could not."

The witnesses for plaintiff and defendant vied with each other in detailing the disreputable and dilapidated condition of the trestle, the plaintiff endeavoring to show the gross negligence of the defendant in sending the plaintiff to his work over such a ruinous structure and the defendant seeking to demonstrate that its unsafe condition was so obvious that plaintiff must have observed it and assumed the risk of going to his place of labor by that route. There can be no question but that the trestle was unsafe and that those in charge of the work there knew that fact and postponed repairs until the completion of the fill should dispense with the necessity of making them. The defendant's foreman testified that in going over it for the first time on the train the ties rattled so that he could hear them above the noise of the train, so that the unsafe condition of the structure and knowledge of this fact by the de-

fendant's agents on the ground must be taken as established.

1, 2. Did the plaintiff assume the risk likely to result from the conditions shown by going to and from his work across the trestle? If a section laborer engaged in work upon a road which is to be repaired assumes the risks incident to traveling in a car across the trestles which carries him to his place of employment, the plaintiff assumed the risk incident to crossing the trestle. Reduced to its lowest terms defendant's proposition amounts to this: The road from Corvallis to Monroe was out of repair and unsafe. This whole eighteen miles constituted a "place." Plaintiff, who was working several miles from the trestle, was engaged in making this dangerous "place," i. e., the whole road, safe, and, therefore, assumed all the risks incident to the work of restoring any part of this stretch of road to its normal condition of safety. This argument proceeds upon the faulty assumption that the whole road or any considerable part of it was in an unsafe condition. The evidence merely indicates that it was somewhat out of repair and not up to the standard of the great transcontinental system of which it was to be a feeder, but beyond this there is no substantial evidence that its general condition rendered it unsafe for travel. Passenger, freight, and gravel trains went over it every day, and no accidents or even delays are mentioned in the evidence. That other sections of the road other than the trestle may have been in an unsafe condition is true, but that there was any risk involved in the particular work in which plaintiff was engaged, which consisted of tamping the ties and raising portions of the track, or that it was in itself dangerous work, is not shown. He was not working upon the trestle, and was not a bridge

builder, or mechanic, and so far as being exposed to
any danger by reason of his employment there is no
evidence that there were any risks attending it either
obvious or latent, if we except his being carried over
a defective and unsafe structure of whose dangers he
was ignorant to and from a place where he could work
in absolute safety. The whole doctrine of assumption
of risk under circumstances of making a dangerous
place safe is summed up by Labatt as follows:

"The principle has already been stated (section 924,
*ante*), that a master's obligations to servants engaged
in doing work of which the essential purpose is to
bring the material substances which will compose the
plant into a condition in which they will be suitable
for use as instrumentalities of a going concern are less
onerous than the obligations which he owes to the ser-
vants who deal with those instrumentalities when the
business is in operation. When viewed from our
present standpoint, facts of the kind involved in the
cases in which this principle is regarded as furnishing
a protection to the master are usually such as to bring
them within the scope of the defense now under dis-
cussion. The position taken is that, although the ser-
vants belonging to the former of the classes above
specified are sometimes exposed to certain risks which
are different in character from, as well as greater in
degree than, those encountered by the other class of
servants, there is no logical ground upon which it can
be asserted that these risks, if they are, as a matter
of fact, ordinarily and naturally incidents of the work
to be done, are not impliedly assumed like other kinds
of risks which answer that description. The necessary
qualifications of this principle are indicated by the
decisions that it can only be invoked against servants.
who are actually connected with the work of construc-
tion; that those servants are entitled to expect a de-
gree of care and skill equal to that ordinarily exercised
in railway construction; and that the defense of an
assumption of ordinary risks is not a bar to the action,

where such servants are injured by a defect in a portion of the road which is already in operation. * * A principle analogous to that which is stated in the preceding section is that a servant who engages in the work of bringing back to a safe condition any part of the plant which has become abnormally dangerous assumes all the risks which are obviously incident to the work thus undertaken.    As regards such a servant those risks are ordinary, even though their existence may, as regards servants whose duties involve merely the use of the instrumentality in question, imply culpability on the master's part.    In other words, a servant put to work to repair a defective appliance cannot be heard to complain of its being defective, 'inasmuch as that very thing is the cause of his being there, and he undertook to set it right, being paid for the risk he ran, and voluntarily incurring it.'    The rule which casts upon the master a liability for failing to provide reasonably safe instrumentalities for the use of his servants is deemed to be suspended under such circumstances": 3 Labatt's M. & S  (2 ed.), §§ 1175, 1176.

The research of learned counsel for defendant has brought to our attention many cases supporting the proposition that where a servant is engaged to make a dangerous place safe, he assumes all the risks necessarily incident to his employment, but none of them go to the extent claimed for defendant in the case at bar.    *Carlson* v. *Oregon Short Line etc. Ry. Co.*, 21 Or. 450 (28 Pac. 497), cited by defendant, arose under an entirely different state of facts.    Heavy rains had occurred along the road, which occasioned floods and landslides for a considerable distance on that line and rendered the track dangerous for travel.    The plaintiff's intestate had been sent out with others to repair and make safe the dangerous portions, and a bridge within the dangerous area gave way, whereby the laborer was killed.    The pleadings are not stated in the opinion, but by reference to the case of *Knahtla*

v. *Oregon S. L. etc. R. Co.,* 21 Or. 136 (27 Pac. 91), which arose out of the same accident and was tried by the same attorneys, it is probable that the negligence charged was the same as in that action, which is as follows: .

"Defendant negligently and carelessly permitted it (bridge) to become and remain out of repair and in an unsafe condition, and negligently and carelessly failed to keep a proper watch and oversight over the same, and negligently and carelessly failed and omitted to ascertain the condition of the same, and to report it to the officers in charge of the train upon which plaintiff was being carried."

Mr. Justice BEAN in his opinion says:

"The court instructed the jury that it is a personal duty the master owes the servant to provide a reasonably safe place for him to work, and to use due and reasonable diligence to make and keep its road-bed and bridges safe for the carriage of persons over the same, and this duty cannot be delegated to an employee so as to relieve it from liability. And, if the master undertake to carry the servant over its railroad from one place to another for the performance of the duties of such servant, it is the duty of the master to furnish a reasonably safe road-bed upon which to carry the servant to his work; and for any neglect of this duty the master is liable to an injured servant. As an abstract proposition of law this rule is probably correct, and in a proper case would be unobjectionable. (*Anderson* v. *Bennett,* 16 Or. 515 (19 Pac. 765, 8 Am. St. Rep. 311); *Miller* v. *Southern Pac. Co.,* 20 Or. 285 (26 Pac. 70).) But it can have no application to the facts of this case. Here, the road of defendant was known to the deceased to be out of repair, and in a dilapidated condition, so much so that the traffic thereon was entirely suspended, and the deceased was employed to assist in putting it in a reasonably safe condition for the passage of trains. In accepting such employment, and undertaking to perform the services

required of him, he voluntarily and necessarily assumed, as part of his contract of employment, the risks incident thereto, among which was the dilapidated condition of the track. * * By the instruction, as given in this case, the jury was told, in effect, that although the deceased knew that the track of defendant was obstructed by slides and damaged by storms, and was not in a safe and proper condition for use, and with knowledge of that fact went out upon a train, with the express purpose of repairing such damages and removing the slides, or assisting others to do so; yet, nevertheless, the defendant was bound to furnish him exactly the same reasonably safe track and road-bed which the law would have required it to furnish had he been engaged in the operation of a train thereon in the ordinary course of business, or had he, in the course of his work, been riding over a road presumedly in good condition. This was not the correct measure of the defendant's duty toward the deceased under the facts of this case.''

He further observes:

''The train upon which he was riding was, with the workmen aboard, patrolling the road, under the direction of the road-master, for the purpose of opening and repairing the same, and was the means of transportation from one place to another, as the necessities of the work might require. He, therefore, took upon himself the risks necessarily·incident to the employment from the damaged condition of the track, unless,· perhaps, they were latent and known to the master, but not known to nor by the use of proper diligence discoverable by him; but he did not take on himself risks, if any, which arose by reason of the negligence of the master, unless they were known to him, or by the use of proper diligence were discoverable by him. So far as the danger of making the repairs was increased by the damaged condition of the track, from natural causes, he assumed the risks of such enhanced danger; but if it were increased by the neglect of the master to use proper care, before the storm, to keep

85 Or.—16

the bridge in repair, or to ascertain the condition of the track or bridge after the storm, or to take such due and proper precautionary measures to prevent accidents to its employees, as the exigencies of the situation might require, he did not assume such risks."

In the case cited the lower court in its charge made no distinction between an employee who, upon the theory of the defendant, was engaged in making the place where he was injured safe, and one who was being carried to a safe place to pursue a safe occupation and failed to take into consideration exigencies which might prevent the master from discovering dangers and guarding against them—exigencies which were as well within the cognizance of the employee as the employer. Here there was no such exigency. The employer knew the condition of the trestle. The plaintiff did not know it and was not required to examine the trestles and bridges over which he passed to ascertain their condition. He had a right to assume that his employer would not send him to his place of labor across a dangerous trestle and to act upon that assumption. It is contended that the condition was so open and obvious that plaintiff must have observed it, but this was a question of fact for the jury. He observed passenger and freight trains pass over it every day, and seeing this might in itself serve to reassure him when we take into consideration the fact that he was a farmer and not a railroad man. In view of the testimony as to the condition of the trestle it seems astounding that those in charge of the road permitted freight and passenger trains to cross it, and the defendant is fortunate that it was this hand-car that was derailed instead of a heavier car loaded with passengers. The authorities cited all relate in substance to cases where the injured person was engaged in re-

pairing or reconstructing the particular dangerous thing or improving the specific dangerous place where the injury occurred, or by which it was occasioned, and all proceed upon the theory that if a man contracts to perform a dangerous work, he assumes the risk of such known and necessary danger and bargains for compensation accordingly.

3–5. The next matter discussed is the charge of the court in relation to furnishing the plaintiff a safe place to work. So far as it goes and as applied to the facts of this case the instruction is good law. It is the duty of the master to furnish the employer a reasonably safe place to work. That duty is performed when he has exercised reasonable diligence to secure that end. The rule is stated by different courts in different language, some using the expression found in *Rush* v. *Oregon Power Co.,* 51 Or. 519 (95 Pac. 193), where it is said:

"It was incumbent upon the defendant to exercise diligence to furnish to its servants reasonably safe appliances, and, in the absence of any notice thereof, the plaintiff had the right to assume that this duty had been fully discharged by the master."

See, also, *Millen* v. *Pacific Bridge Co.,* 51 Or. 538 (95 Pac. 196); *Allen* v. *Standard Box & Lumber Co.,* 53 Or. 10 (96 Pac. 1109, 97 Pac. 555, 98 Pac. 509); *Galvin* v. *Brown & McCabe,* 53 Or. 598 (101 Pac. 671); *Moulton* v. *St. Johns Lbr. Co.,* 61 Or. 62 (120 Pac. 1057). Other cases in this state approve substantially the language used by the court in the instruction given in the instant case. Thus in *Kovachoff* v. *St. Johns Lbr. Co.,* 61 Or. 174 (121 Pac. 801), this language is employed:

"Independent of any statute, the master is bound to furnish for his employees a reasonably safe place in

which to work, and reasonably safe tools and appliances with which to operate.''

And in *Field* v. *Northwest Steel Co.*, 67 Or. 126 (135 Pac. 320), it is said:

''Bearing in mind, also, that by a thoroughly established rule it is the nondelegable duty of the master to furnish the employee with reasonably safe tools with which to work, we observe that at the time the accident happened, the foreman was engaged in preparing a tool for the use of the plaintiff.''

See, also, *Morandas* v. *L. R. Wattis Co.*, 71 Or. 367 (142 Pac. 537). The term ''reasonably safe'' implies such measure of safety as accords with common usage and practice in matters of a particular character. ''Reasonable safety'' implies such a condition as ordinary care and diligence will secure. There is a slight technical distinction between using ordinary care and diligence to make a structure reasonably safe and actually making it so, but it is one that would not appeal to the average juror. In the case at bar it is so evident from the testimony of defendant's own witnesses that no diligence whatever was used to make the trestle reasonably safe that an instruction to the effect that defendant should have exercised reasonable diligence to make it so would have been useless. The instruction which we criticised in *Olsen* v. *Silverton Lbr. Co.*, 67 Or. 167 (135 Pac. 752), was as follows: ''The defendant must also provide safe and suitable appliances,'' etc. This instruction left out the words ''reasonably safe'' used in the instruction here, and made the employer an absolute insurer not only of the safety of its appliances, but of the skill and competency of plaintiff's fellow-servants. As we before remarked the instruction given in this case was good so far as it went. If defendant had asked for an instruc-

tion couched in the language employed in *Millen* v. *Pacific Bridge Co.*, 51 Or. 538 (95 Pac. 196), it would have been proper to have given it, although in view of the utter lack of diligence of defendant's servants in respect to taking precautions for the safety of persons passing over its road such an instruction could not possibly have changed the result. There was no such request, and we are satisfied that the defendant was not injured by the omission.

6. Exception is taken to refusal of the court to give certain instructions asked by defendant. In some respects these were inapplicable, and so far as applicable they were sufficiently covered by the general charge.

Exception was also taken to certain remarks of counsel for plaintiff wherein he denounced the defendant in very strong terms for its negligence. There was some ground for the censure passed by counsel, and it did not go beyond what counsel very frequently indulge in when wrought up by the excitement of the trial or when demonstrating to a client that they are earning their fee. We cannot say that it was so intemperate as to justify a reversal of the case, although such appeals are in bad taste and usually ineffective for good or harm. Other alleged misconduct of counsel is discussed in the brief, but is not assigned in the abstract, and will not be considered.

Upon the whole case we are of the opinion that the record is free from prejudicial error, that the defendant had the advantage of a fair and impartial trial, and that the judgment should be affirmed.

AFFIRMED.

MR. JUSTICE MOORE, MR. JUSTICE BEAN and MC-CAMANT concur.